John W. Howard (SBN 80200)
Michelle D. Volk (SBN 217151)
Andrew G. Nagurney (SBN 301894)
Alyssa P. Malchiodi (SBN 282774)
JW Howard/Attorneys, Ltd.
701 B Street, Suite 1725
San Diego, California 92101
Tel: 619-234-2842  Fax: 619-234-1716
Email: Johnh@jwhowardattorneys.com

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| HEALTH FREEDOM DEFENSE FUND, INC., a Wyoming Not-for-Profit Corporation; MIGUEL SOTELO; MARIEL HOWSEPIAN-RODRIGUEZ; JEFFREY FUENTES; SANDRA GARCIA; and HOVHANNES SAPONGHIAN; NORMA BRAMBILA;<br><br>        Plaintiffs,<br><br>    v.<br><br>MEGAN K. REILLY, in her official capacity as Interim Superintendent of the Los Angeles Unified School District; ILEANA DAVALOS, in her official capacity as Chief Human Resources Officer for the Los Angeles Unified School District; GEORGE MCKENNA, MÓNICA GARCÍA, SCOTT SCHMERELSON, NICK MELVOIN, JACKIE GOLDBERG, KELLY GONEZ, and TANYA | Case No.:<br><br>**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

JW HOWARD/ ATTORNEYS LTD
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

1

ORTIZ FRANKLIN, in their official
capacities as members of the Los
Angeles Unified School District
governing board.

Defendants.

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

Plaintiffs, for their Complaint against Defendants, allege as follows:

## **INTRODUCTION**

1.     On March 4, 2021, Defendants' predecessors issued a policy requiring that employees of the Los Angeles Unified School District ("LAUSD") be vaccinated against COVID-19. *See California Educators for Medical Freedom, et al v. Austin Beutner, et al*, Case No. 21-cv-2388 (the "Original Lawsuit"). In response, the Original Lawsuit was filed on March 17, 2021. *Id*. at Ecf. No. 1.

2.     On March 18, 2021, in a frankly cynical effort to create a ripeness issue, LAUSD reversed its policy and gave employees the option of regular testing. Ecf. No. 25 at ¶¶76-86. As a result, Defendants' predecessors argued that Plaintiffs' allegations relied on a future contingency *that might not occur*, and that the lawsuit was therefore not ripe for adjudication. *Id*. at Ecf. 33-1, 41.

3.     On July 27, 2021 the Court dismissed the case, without prejudice, based on ripeness. *Id*. at Ecf. No. 44. "That Defendants were contemplating requiring the vaccine," the Court concluded, "and then later reversed course and explicitly said they would not be, does not create a ripe case or controversy."

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

4.     Nevertheless, on August 13, 2021 – *a mere 17 days after winning dismissal based on ripeness* – Defendants enacted a mandatory "COVID-19 VACCINATION REQUIREMENT FOR EMPLOYEES AND OTHER ADULTS WORKING AT DISTRICT FACILITIES." (the "Mandate"). *See* Exhibit "A", attached hereto. That, of course, was the plan all along. Employees must receive the first dose by October 15, 2021, 2021.[1]

5.     Plaintiffs have been notified that if they fail to comply with the deadline of October 15, 2021, they will be forbidden from returning to work effective October 16 and will be terminated effective November 1, 2021.

6.     Prior representations to the Court notwithstanding, Defendants were at least honest enough to call their policy a "mandate."

7.     Plaintiffs assert that Defendants' Mandate cannot be supported when:

    i.     Over 99.8% of all those who are infected and ill with COVID survive.

    ii.     Those who survive obtain robust and durable natural immunity.

    iii.     The natural immunity so obtained is superior to COVID vaccine-induced immunity.

    iv.     The COVID vaccines are ineffective against the Delta strain of COVID, which the Center for Disease Control ("CDC") states is the dominant (>99%) strain throughout the United States.

    v.     The CDC Director admitted that the COVID vaccines do not prevent infection or transmission of COVID. "[W]hat they [the vaccines] can't do anymore is prevent transmission."[2]

---

[1]     Extended from the original deadline of October 15, 2021.
[2]     Madeline Holcomb, *Fully Vaccinated People Who Get a CoVID-19 Breakthrough Infection Transmit the Virus, CDC Chief Says,* CNN Health (August 6, 2021) https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html (last visited October 18, 2021), *see also* The New England Journal of Medicine, *Resurgence of SARS-CoV-2 Infection in a Highly Vaccinated Health System Workforce,* N Engl J Med 2021; 385:1330-1332 (September 30, 2021) https://www.nejm.org/doi/full/10.1056/NEJMc2112981(last visited October 18, 2021).

3

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

vi.   The CDC acknowledged that the vaccinated and unvaccinated are equally likely to spread the virus.[3]

vii.  The vaccines only reduce symptoms of those who are infected by COVID, but not transmission of the virus. They are, therefore, treatments, and not vaccines as that term has always been defined in the law.

viii. In fact, the CDC has actually changed its definitions of "vaccine" and "vaccination" to fit with the currently-available COVID Vaccines. Until recently, the Centers for Disease Control defined a "Vaccine" as: "A product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease."[4]

ix.   The CDC also previously defined "Vaccination" as: "The act of introducing a vaccine into the body to produce immunity to a specific disease."[5]

x.    Both prior definitions fit the common understanding of those terms. To be *vaccinated* meant that you should have lasting, robust immunity to the disease targeted by the *vaccine*.

xi.   But on September 1, 2021, the CDC quietly rewrote these definitions. It changed the definition of a "Vaccine" to: "A ~~product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease~~ *preparation that is used to*

---

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

[3]    Brown CM, et al., Outbreak of SARS-CoV-2 Infections, Including COVID 19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings-Barstable County, Massachusetts, July 2021. MMWR Morb Mortal Wkly Rep 2021;70:1059-1062.  https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w (last visited  October 18, 2021).
[4]    *Immunization: The Basics* (archived version), Centers for Disease Control and Prevention https://web.archive.org/web/20210826113846/https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm (last visited October 20, 2021).
[5]    *Id*.

4

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

*stimulate the body's immune response against diseases*."[6] It changed the definition of "Vaccination" to: "The act of introducing a vaccine into the body to produce ~~immunity to~~ *protection from* a specific disease."[7]

xii.     In other words, the CDC has eliminated the word "immunity" from its definitions of "Vaccine" and "Vaccination." The CDC did so because it recognizes that the COVID Vaccines do not produce immunity to COVID-19.

xiii.    This is a critical factual and legal distinction. Legal authority to mandate medical treatment only derives under public health regulations. As the CDC holds that Delta is the only strain; that the shots do not stop the transmission of Delta; and that vaccination is mere "protection" against a disease and not "immunity" against the disease; there is no public health basis for mandating vaccination.

xiv.    The COVID vaccines cause a significantly higher incidence of injuries, adverse reactions, and deaths than any prior vaccines that have been allowed to remain on the market, and, therefore, pose a significant health risk to recipients, who are, by definition, healthy when they receive the COVID vaccines; and

xv.     Since, according to the CDC, the COVID vaccines do not prevent the infection or transmission of COVID, while at the same time, also according to the CDC, they result in a massively anomalous (1000% higher) number of adverse events and deaths, there is no justification in the law for mandating them, and LAUSD's mandate must therefore be struck down.

---

[6] *Immunization: The Basics*, Centers for Disease Control and Prevention https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm (last visited October 20, 2021).
[7] *Id*.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

**PARTIES**

8.    Plaintiffs reallege all allegations set forth elsewhere in this Complaint as if fully set forth herein.

9.    Plaintiff Health Freedom Defense Fund (hereinafter, "HFDF") is a not-for-profit public benefit Wyoming corporation with its headquarters in Sandpoint, Idaho. HFDF is a member organization that seeks to advocate for and educate the public on the topics of medical choice, bodily autonomy, and self-determination, and that opposes laws and regulations that force individuals to submit to the administration of medical products, procedures, and devices against their will. Several of HFDF's members are LAUSD employees who are directly affected by the Mandate, and therefore would have standing in their own right to bring this action. *See* Declarations, attached hereto as Composite Exhibit "B". These include persons with natural immunity and religious objections to vaccination whose exemptions have been denied.  As well, the interests at stake in this case are germane to HFDF's purpose, and neither the claims asserted, nor the relief requested requires the individual participation of its members.

10.    Plaintiff MIGUEL SOTELO is a citizen of Los Angeles County and is employed by LAUSD as an Electrician.

11.    Plaintiff MARIEL HOWSEPIAN-RODRIGUEZ is a citizen of Los Angeles County and is employed by LAUSD as a Technology Coordinator and Computer Lab Teacher.

12.    Plaintiff JEFFREY FUENTES is a citizen of Los Angeles County and is employed by LAUSD as an Electrician.

13.    Plaintiff SANDRA GARCIA is a citizen of Los Angeles County and is employed by LAUSD as a Special Education Assistant.

14.    Plaintiff HOVHANNES SAPONGHIAN is a citizen of Los Angeles County and is employed by LAUSD as a Teacher Assistant.

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

15.   Plaintiff NORMA BRAMBILA is a citizen of Los Angeles County and is employed by LAUSD as a Healthcare Assistant.

16.   Allegations regarding "Plaintiffs" hereinbelow shall be deemed to include the individual Plaintiffs and the members of Plaintiff HFDF.

17.   Defendant MEGAN K. REILLY is the Interim Superintendent of LAUSD and is *sui juris*. Ms. Reilly is ultimately charged with, *inter alia*, enforcing all employment policies of the LAUSD. She is being sued in her official capacity.

18.   Defendant ILEANA M. DAVALOS is the Chief Human Resources Officer for LAUSD and is *sui juris*. On information and belief, Ms. Davalos is charged with developing and enforcing all employment policies of LAUSD, including the Mandate. She is named as a defendant herein in her official capacity.

19.   Defendants GEORGE MCKENNA, MÓNICA GARCÍA, SCOTT SCHMERELSON, NICK MELVOIN, JACKIE GOLDBERG, KELLY GONEZ, and TANYA ORTIZ FRANKLIN are LAUSD's governing board members. They are named as Defendants herein in their official capacities.

20.   Defendants Reilly and Davalos have personally undertaken actions under color of law that deprive or imminently threaten to deprive Plaintiffs of certain rights, privileges, and immunities under the laws and Constitution of the United States, and under the laws and Constitution of the State of California. Upon information and belief, the other defendants have also personally undertaken actions under color of law that deprive or imminently threaten to deprive Plaintiffs of certain rights, privileges, and immunities under the laws and Constitution of the United States, and under the laws and Constitution of the State of California

21.   This lawsuit seeks prospective relief against Defendants in their official capacities.

22.   Defendants, through their acts and omissions complained of herein are liable to Plaintiffs for damages in an amount to be proven at trial including, but limited

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

to, damages for lost income, loss of employment opportunities and deprivation of constitutional and other civil rights. But for Defendants' qualified immunity this suit would include a demand that Plaintiffs be compensated for these damages. Upon information and belief, discovery will reveal grounds for claiming one or more exceptions to the doctrine of qualified immunity. If that occurs, Plaintiffs will seek leave to amend this Complaint to assert claims for money damages against Defendants in their individual capacities.

## JURISDICTION AND VENUE

23.    Plaintiffs reallege all allegations set forth elsewhere in this Complaint as if fully set forth herein.

24.    This Court has jurisdiction to hear this case under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States, as well as under 28 U.S.C. § 1343(3) in relation to Defendants' intent to deprive Plaintiffs of certain rights, privileges, and immunities as detailed herein.

25.    This Court has jurisdiction over the claims asserting violations of the laws and Constitution of the State of California through its supplemental jurisdiction under 28 U.S.C. § 1367(a), as those claims are so closely related to the Plaintiffs' federal question and 42 U.S.C. § 1983 claims that they form part of the same case or controversy under Article III of the United States Constitution.

26.    This Court has the authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(a), Rule 65 of the Federal Rules of Civil Procedure, and its traditional equitable power to enjoin unconstitutional actions by state agencies and officials; and attorneys' fees and costs under 42 U.S.C. § 1988.

27.    The Central District of California, Western Division is the appropriate venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the District

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

in which Defendants reside, exercise their authority in their official capacities, and/or have threatened to deprive Plaintiffs of the rights and liberties under the laws and Constitution of the United States, and in addition thereto to violate the laws and Constitution of the State of California, as further alleged herein. It is also the District in which a substantial part of the events giving rise to Plaintiffs' claims have occurred and continue to occur.

## **GENERAL ALLEGATIONS**

28.     On January 30, 2020, the World Health Organization ("WHO") declared a "public health emergency of international concern over the global outbreak" of COVID-19. Among other recommendations, the WHO called for accelerated development of "vaccines, therapeutics and diagnostics."

29.     On January 31, 2020, President Trump first issued a public health state of emergency in the United States under the Public Health Service Act due to COVID.

30.     Also on January 31, 2020, Secretary of Health and Human Services Alex M. Azar II, issued a Declaration of a Public Health Emergency effective as of January 27, 2020. This declaration has been renewed thereafter on April 21, 2020, July 23, 2020, October 2, 2020, January 7, 2021, April 15, 2021, and July 19, 2021.

31.     President Trump issued a subsequent declaration of emergency under the Stafford Act and National Emergencies Act on March 13, 2020, due to COVID.

32.     A third declaration of emergency was issued by President Trump on March 18, 2020, under the Defense Production Act due to COVID.

33.     On February 24, 2021, President Biden extended President Trump's March 13, 2020 declaration of emergency, stating as a reason for doing so that more "than 500,000 people in this Nation have perished from the disease."[8]

---

[8] President Joseph R. Biden, Jr., *Notice on the Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic* (February 24, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/24/notice-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic/

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

34.     Thus, the United States has been in a constant state of emergency due to COVID (the "COVID Emergency") since January 31, 2020, a period of over twenty months.

35.     The COVID Emergency has been used to justify lockdowns, banning of worship services, mandatary masks, vaccine passports, and now mandatory vaccinations such as the vaccination requirement LAUSD has placed on each of its employees upon penalty of termination.

36.     Never in this history of this nation have its citizens been subjected to such invasions of their individual rights and liberties.

**COVID-19 Is Not Smallpox**

**A.     The Statistics Underlying Defendants' Justification for the Mandate are Flawed**

**i.     The PCR Test is Flawed**

37.     The Covid Emergency is based upon statistics that are flawed for at least the following reasons:

      i.     Every statistic regarding COVID is based upon the PCR test, which is a limited test that cannot, on its own, determine whether a test subject is infected with COVID absent an examination by a medical doctor;

      ii.     The PCR test is highly sensitive, with the result of the test being dependent upon the cycle threshold ("CT") at which the test is conducted;

      iii.     National Institute of Allergy and Infectious Diseases, Dr. Anthony Fauci, has stated that a test conducted at a CT of over 35 is useless;[9]

---

[9] YouTube.com, *Dr. Tony Fauci - PCR cycles* (October 30, 2020), https://www.youtube.com/watch?v=A867t1JbIrs; *see* NYTimes.com, *Your Coronavirus Test Is Positive. Maybe It Shouldn't Be*. August 29, 2020), https://www.nytimes.com/2020/08/29/health/coronavirus-testing.html (last visited October 18, 2021).

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

    iv.    Studies have confirmed Dr. Fauci's conclusion, showing that tests conducted using CT values over 35 have yielded up to eighty percent (80%) false positives;[10]

    v.    Despite this known sensitivity, the PCR tests were mass distributed in the United States without training, were used by technicians who were not made aware of the underlying flaw in the test,[11] and were operated at a CT value in excess of 35 routinely, therefore, delivering results that were, according to Dr. Fauci and a broad consensus of experts in the area, useless;[12] and

    vi.    The PCR test is incapable of distinguishing a live particle of a virus from a dead one, and as a result, even a positive test result does not mean that the test subject is infected or contagious with COVID, analogous to a test that could identify car parts (such as an axle, wheels, engine) but not determine if those car parts were in fact, a working car.

---

[10] Corman-Drosten Review Report, *External peer review of the RTPCR test to detect SARS-CoV-2 reveals 10 major scientific flaws at the molecular and methodological level: consequences for false positive results*, Section 3 (November 27, 2020), https://cormandrostenreview.com/report/(last visited October 18, 2021).; *see* The Lancet *Clarifying the evidence on SARS-CoV-2 antigen rapid tests in public health responses to COVID-19* (February 17, 2021), ("This suggests that 50–75% of the time an individual is PCR positive, they are likely to be post-infectious."), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)00425-6/fulltext#%20; DOI: https://doi.org/10.1016/S0140-6736(21)00425-6;
*see also* https://www.aerztezeitung.de/Wirtschaft/80-Prozent-der-positiven-Corona-Schnelltests-falsch-positiv-421053.html (July 4, 2020) (last visited October 18, 2021)., (The fact that the high rate of false positive tests in large-scale testing in the population occurs at a time of low viral incidence is demonstrated in the article from the German Ärztezeitung. At the end of the regular cold season (May), about 50% of rapid tests were already reported as false positive, and this rate increased until it reached 80% false positive tests in June.); *compare*, *Comparison of seven commercial SARS-CoV-2 rapid point-of-care antigen tests: a single-centre laboratory evaluation study* (July 2021), ("false-positives do occur with AgPOCTs at a higher rate than with RT-rtPCR."), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8026170/. DOI: 10.1016/S2666-5247(21)00056-2(last visited October 18, 2021).
[11] NPR *CDC Report: Officials Knew Coronavirus Test Was Flawed But Released It Anyway* (November 6, 2020), https://www.npr.org/2020/11/06/929078678/cdc-report-officials-knew-coronavirus-test-was-flawed-but-released-it-anyway (last visited October 18, 2021)
[12] YouTube.com, *Dr. Tony Fauci - PCR cycles* (October 30, 2020), https://www.youtube.com/watch?v=A867t1JbIrs (last visited October 18, 2021).

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

### ii.      The Asymptomatic Spreader is a Myth

38.      Due to the numerous flaws in the fundamental test upon which all statistics underlying the COVID Emergency are based, and the high level of resulting false positives, many have incorrectly concluded that asymptomatic people, who in the past would simply have been referred to as "healthy people," are somehow contagious and are spreading the disease.

39.      Policy decisions at the state and federal level rest upon this myth. For example, mandatory masking of healthy people is based upon this myth. Social distancing is based upon this myth as well. The policy that perfectly healthy, non-contagious people must be vaccinated to interact with and participate in society is based in large degree upon this myth. With regard to flawed statistics, mass PCR testing of the entire population has been based upon this myth.[13] There is no reason to test perfectly healthy asymptomatic people absent the belief that asymptomatic people can spread COVID.

40.      However, the assumption that people with no symptoms can spread the disease is false. As Dr. Fauci stated during a September 9, 2020: "[E]ven if there is some asymptomatic transmission, in all the history of respiratory borne viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver of outbreaks is always a symptomatic person, even if there is a rare asymptomatic person that might transmit, an epidemic is not driven by asymptomatic carriers."[14]

41.      Due to the incorrect assumption that asymptomatic people could spread the disease, mass testing has been instituted of the population at large. Due to the numerous flaws in the PCR test stated above, this mass testing has resulted in

---

[13] Corman-Drosten Review Report, *External peer review of the RTPCR test to detect SARS-CoV-2 reveals 10 major scientific flaws at the molecular and methodological level: consequences for false positive results.* (November 27, 2020), https://cormandrostenreview.com/report/ (last visited October 18, 2021)

[14] Shaun Griffin, *Covid-19: Asymptomatic cases may not be infectious, Wuhan study indicates,* https://www.bmj.com/content/371/bmj.m4695(last visited October 18, 2021); *See also*,YouTube.com, *Update on the New Coronavirus Outbreak First Identified in Wuhan, China | January 28,* 2020 (January 28, 2020), https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2638s (last visited October 18, 2021).

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

dramatically inflated case numbers that do not reflect reality and falsely overstate the number of COVID cases.

42.     As a result, the data regarding COVID cases being used to shape public policy is highly inflated.

### iii.        The COVID Hospitalization Count is Highly Inflated

43.     Every patient that is admitted to a hospital is subject to a PCR test due to the perceived COVID Emergency.

44.     The PCR test used upon admission is subject to the numerous flaws identified above, and, therefore, results in the dramatic inflation of COVID patients who have been hospitalized.

45.     Moreover, the CARES Act increases reimbursements to hospitals for all patients who have been diagnosed with COVID, creating an economic incentive for hospitals to find a COVID diagnosis.

46.     As a result, the COVID hospitalization data being used to shape public policy is highly inflated.

### iv.        The COVID Death Count is Highly Inflated

47.     On March 24, 2020, the CDC issued COVID Alert Number 2.15 This Alert substantially changed how the cause of death was to be recorded exclusively for COVID. The modification ensured that in any case where the deceased had a positive PCR test for COVID, then COVID was listed as the cause of death.[16]

48.     Prior to this March 24, 2020, change in procedure, COVID would only have been listed as the cause of death in those cases where COVID was the actual cause of death. If the deceased had a positive PCR test for COVID, but had died of

---

[15] National Vital Statistics System, *COVID-19 Alert No. 2* (March 24, 2020), https://www.cdc.gov/nchs/data/nvss/coronavirus/Alert-2-New-ICD-code-introduced-for-COVID-19-deaths.pdf (last visited October 18, 2021).
[16] *Id*.

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

13

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

1   another cause, then COVID would have been listed as a contributing factor to the

2   death, but not the cause.[17]

3       49.    The 2003 CDC Medical Examiner's and Coroner's Handbook on Death

4   Registration and Fetal Death Reporting states that in the presence of pre-existing

5   conditions, infectious disease is recorded as the contributing factor to death, not the

6   cause.[18] This was always the reporting system until the death certificate modification

7   issued by the CDC on March 24, 2020.[19]

8       50.    This death certificate modification by the CDC was not made for any

9   other disease; only COVID. Accordingly, a double standard was created for the

10  recordation of deaths, skewing the data for all deaths after March 24, 2020, reducing

11  the number of deaths from all other causes, and dramatically increasing the number of

12  deaths attributed to COVID.

13      51.    As a result, the COVID death data used to shape public health policy is

14  significantly inflated.[20]

15                  **v.    COVID Has an Extremely High Survivability Rate**

16      52.    According to the CDC the survivability of COVID-19 is extraordinarily

17  high. Survival rates under age 20 is 99.997%, 20-50 is 99.98%, 50-70 is 99.5% and

18  70+ is 94.6%. These figures calculate the percentage of confirmed COVID infected

19  patients who survive.

20      53.    By comparison, the smallpox epidemic of the early 1900s is reported to

21  have been fatal to over 30% of those who contracted it, according to the FDA.[21]

22

23  [17] *Id*.

24  [18] Medical Examiners' and Coroners' Handbook on Death Registration and Fetal Death Reporting, 2003 Revision. CDC, 2003, Pgs. 13-16. https://www.cdc.gov/nchs/data/misc/hb_me.pdf (last visited October 18, 2021).

25  [19] National Vital Statistics System, *COVID-19 Alert No. 2* (March 24, 2020), https://www.cdc.gov/nchs/data/nvss/coronavirus/Alert-2-New-ICD-code-introduced-for-COVID-19-deaths.pdf.

26  [20] CDC, *COVID-19 Forecasts: Deaths* (last accessed September 30, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/forecasting-us.html (last visited October 18, 2021)

27  [21] *See* CDC, *History of Smallpox*, ("On average, 3 out of every 10 people who got it died."), https://www.cdc.gov/smallpox/history/history.html (last visited October 18, 2021); *see also* AMNH.org, SMALLPOX,

28  https://www.amnh.org/explore/science-topics/disease-eradication/countdown-to-zero/smallpox (last visited October 18, 2021); *but see*, NCBI.gov., *Remaining Questions about Clinical Variola Major* ("Evidence has shown that the death rate

14

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

### vi.     COVID Survivors Enjoy Robust Natural Immunity

54.     Those who recover from infection from COVID, over 99% of those who are infected, enjoy robust and durable natural immunity. Natural immunity is superior to vaccine-induced immunity resulting from the COVID vaccines, which do not prevent re-infection or transmission of COVID, and do not prevent infection, re-infection or transmission of the current Delta strain.

### B.     Mandating COVID Vaccination is Contrary to Public Policy.

55.     As the CDC tacitly concedes by changing its own definitions of "Vaccine" and "Vaccination," the COVID vaccines are not vaccines in the traditional sense. In fact, the FDA classifies them as "CBER-Regulated Biologics" otherwise known as "therapeutics" which falls under the "Coronavirus Treatment Acceleration Program."[22]

56.     The Vaccines are misnamed since they do not prevent either re-infection or transmission of the disease, the key elements of a vaccine. The CDC has publicly stated that the Vaccines are effective in reducing the severity of the disease but not infection, re-infection, or transmission. Indeed, as noted above, the CDC has stricken the very word "immunity" from its definitions of "Vaccine" and "Vaccination." The injection is therefore a treatment, not a vaccine.

57.     The current strain of COVID is the Delta strain.[23] The CDC Director has stated that the vaccines do not stop the transmission of the Delta strain. Studies show the Delta strain passes easily amongst vaccinated persons.[24] The CDC website states:

---

from smallpox among pregnant women was extraordinarily high. Pregnant women had a higher rate of hemorrhagic disease than did other adults. Approximately 16% of cases in unvaccinated pregnant women were early hemorrhagic smallpox versus ≈1% in nonpregnant women and adult males. The case-fatality rate in unvaccinated pregnant women approached 70%. Fetal wastage approached 80%."), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3377426/ (last visited October 18, 2021).

[22] FDA, *Coronavirus (COVID-19) | CBER-Regulated Biologics*, https://www.fda.gov/vaccines-blood-biologics/industry-biologics/coronavirus-covid-19-cber-regulated-biologics (last visited October 18, 2021); *See also,* FDA, *Coronavirus Treatment Acceleration Program (CTAP)*, https://www.fda.gov/drugs/coronavirus-covid-19-drugs/coronavirus-treatment-acceleration-program-ctap (last visited October 18, 2021).

[23] CDC, *Variant Proportions* (last visited September 30, 2021), https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last visited October 18, 2021).

[24] The Lancet, *Transmission of SARS-CoV-2 Delta Variant Among Vaccinated Healthcare Workers, Vietnam* (August 10, 2021), https://ssrn.com/abstract=3897733 (last visited October 18, 2021).

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

"… preliminary evidence suggests that fully vaccinated people who do become infected with the Delta variant can spread the virus to others."[25]

58.    The effectiveness of the COVID vaccines has been determined to wane rapidly. Israel, the most vaccinated and studied nation, now expires the vaccine's effectiveness at six months.[26] The requirement for booster shots due to this waning of effectiveness has been recognized by the CDC, which initially recommended no booster shots, then annually, then at 8 months and then 6 months.

59.    Those countries with the highest rates of COVID vaccination also experience the highest rates of infection. Those counties with the highest rates of vaccination also have the highest rates of hospitalization and severe illnesses with regard to the Delta strain, which is the current strain.

**C.    VAERS Reports Point to Significant Levels of Vaccine Injury.**

60.    As part of the 1990 Public Readiness and Emergency Preparedness Act, the FDA and CDC created the Vaccine Adverse Event Reporting System (VAERS) to receive reports about suspected adverse events that may be associated with vaccines. VAERS is intended to serve as an early warning system to safety issues.

61.    It has been well established even prior to COVID that only 1-10% of adverse events are reported.[27] This is known as the "Under-Reporting Factor" (URFs). While many reported adverse events are mild, about 15% of total adverse events are found to be serious adverse events.[28]

62.    As one can see from this chart, VAERS reports regarding the COVID vaccines are extraordinarily high.

---

[25] CDC, *Interim Public Health Recommendations for Fully Vaccinated People,* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (last visited October 18, 2021).
[26] Marianne Guenot, *Isreal's Vaccine Pass Will Expire 6 Months after 2nd Dose, Meaning People Will Need Booster Shots to Keep Going to Restaurants and Bars,* https://www.businessinsider.com/israel-vaccine-pass-to-expire-after-6-months-booster-shots-2021-9 (last visited October 18, 2021).
[27] Lazarus, Ross et al. Grant ID: R18 HS 017045. *Electronic Support for Public Health–Vaccine Adverse Event Reporting System (ESP:VAERS).* Submitted to The Agency for Healthcare Research and Quality (AHRQ).
[28] Department of Health and Human Services, *VAERS Data Use Guide,* https://vaers.hhs.gov/docs/VAERSDataUseGuide_November2020.pdf (last visited October 18, 2021).

16



Figure 1:  Bar plots showing the number of VAERS reports (left) and reported deaths (right) per year for the past decade. (2021 is partial data set.)

**D.** **COVID Vaccines Create Immunological Cripples, Vaccine Addicts, Super-Spreaders, and a Higher Chance of Death and Severe Hospitalization**

63.    The COVID vaccines are not traditional vaccines.[29] Instead most carry coded instructions that cause cells to reproduce one portion of the SARS-CoV-2 virus, the spike protein. The vaccines thus induce the body to create spike proteins. A person only creates antibodies against this one limited portion (the spike protein) of the virus. This has several downstream deleterious effects.

64.    First, these vaccines "mis-train" the immune system to recognize only a small part of the virus (the spike protein). Variants that differ, even slightly, in this protein, such as the Delta variant, are able to escape the narrow spectrum of antibodies created by the vaccines.

65.    Second, the vaccines create "vaccine addicts," meaning persons become dependent upon regular booster shots, because they have been "vaccinated" only against

[29] FDA, *Coronavirus (COVID-19) | CBER-Regulated Biologics*, https://www.fda.gov/vaccines-blood-biologics/industry-biologics/coronavirus-covid-19-cber-regulated-biologics; *See also,* FDA, *Coronavirus Treatment Acceleration Program (CTAP)*, https://www.fda.gov/drugs/coronavirus-covid-19-drugs/coronavirus-treatment-acceleration-program-ctap (last visited October 18, 2021).

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

a tiny portion of a mutating virus. The Australian Health Minister Dr. Kerry Chant has stated that COVID will be with us forever and people will "have to get used to" taking endless vaccines. "This will be a regular cycle of vaccination and revaccination."[30]

66.     Third, the vaccines do not prevent infection in the nose and upper airways, and vaccinated individuals have been shown to have much higher viral loads in these regions. This leads to the vaccinated becoming "super-spreaders" as they are carrying extremely high viral loads.[31]

67.     In addition, the vaccinated become more clinically ill than the unvaccinated. Scotland reported that the infection fatality rate in the vaccinated is 3.3 times the unvaccinated and the risk of death if hospitalized is 2.15 times the unvaccinated.[32]

**E.     Effective Treatments are Available**

  **i.     Ivermectin is Effective**

68.     Ivermectin--a cheap, safe, widely available generic medication, whose precursor won the Nobel Prize in Medicine in 2015--treats and cures SARS-CoV-2 infection, both while in the early infectious stage and later stages.[33] The evidence is both directly observed in multiple randomized controlled trials and epidemiological evidence worldwide. There are now more than sixty (60) studies demonstrating its efficacy as well as noting that nations that use ivermectin see their death rates plummet to 1% of the death rates of nations that do not.

---

[30] Tyler Durden, *Aussie Health Chief: COVID Will Be With Us Forever", People Will Have to "Get Used To" Endless Booster Vaccines,* https://www.zerohedge.com/covid-19/aussie-health-chief-covid-will-be-us-forever-people-will-have-get-used-endless-booster (last visited October 18, 2021).

[31] Chau, Nguyen Van Vinh, et al., OUCRU COVID-19 Research, Transmission of SARS-CoV-2 Delta Variant Among Vaccinated Healthcare Workers (abstract), Vietnam. EClinicalMedicine, Volume 41, November 2021, 101143, Available at SSRN: https://ssrn.com/abstract=3897733 or http://dx.doi.org/10.2139/ssrn.3897733

[32] Jeffrey Dach, Protecting Public Health with Mandatory Vaccination, https://jeffreydachmd.com/wp-content/uploads/2021/08/Public-Health-Scotland-21-08-04-covid19-publication_report.pdf, (last visited October 18, 2021), *See also,* Jeffrey Dach, Public Health Scotland COVID-19 Statistical Report, https://jeffreydachmd.com/wp-content/uploads/2021/09/Public-Health-Scotland-21-09-01-covid19-publication_report.pdf (last visited October 18, 2021) e

[33] Ivmmeta.com, *Ivermectin for COVID-19: real-time meta analysis of 63 studies,* https://ivmmeta.com/ivm-meta.pdf (last visited October 18, 2021).

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

### ii.    Hydroxychloroquine is Effective

69.    Hydroxychloroquine (HCQ) is a cheap, safe, widely available generic medication used billions of times annually in all countries around the world including the United States. It is typically prescribed for rheumatoid arthritis and lupus. HCQ treats and cures SARS-CoV-2 infection effectively in the early infectious stage. HCQ also provides substantial reduction in mortality in later stages.[34],[35] There are now more than 300 studies demonstrating its efficacy and nations that use HCQ have 1-10% of the death rate of nations that do not. HCQ is on the WHO's List of Essential Medications that all nations should always have available. Chloroquine (an earlier version of HCQ) has been in continuous use for SARS-CoV-2 in China since February 2020.[36]

### iii.    Budesonide is Effective

70.    Budesonide, a cheap, safe, widely available generic inhaler medication used commonly in the United States, typically for emphysema, effectively treats SARS-CoV-2 infection while in the early infectious stage.[37] This was published in The Lancet in April 2021.[38] The trial at ClinicalTrials.gov was stopped early because steroids were shown to be so effective.[39]

---

[34] HCQmeta.com, *HCQ for COVID-19:real-time meta analysis of 294 studies,* https://hcqmeta.com
[35] https://docs.google.com/document/d/1vDD8JkHe62hmpkalx1tejkd_zDnVwJ9XXRjgXAc1qUc/edit (last visited October 18, 2021).
[36] Jianjun Gao, *Chloroquine Phosphate has Shown Apparent Efficacy in Treatment of COVID-19 Associated Pneumonia in Clinical Studies,* https://www.jstage.jst.go.jp/article/bst/14/1/14_2020.01047/_article (last visited October 18, 2021).
[37] Sanjay Ramakrishanan et al., *Inhaled Budesonide in the Treatment of Early COVID-19 Illness: A Randomized Controlled Trial,* Oxford University, https://c19protocols.com/wpcontent/uploads/2021/03/COVID_Budesonide_Oxford-Based_Dosing_Guidance.pdf (last visited October 18, 2021).
[38] The Lancet, *Inhaled Budesonide in the treatment of early COVID-19 (STOIC): a phase 2, open-label randomized controlled trial* (July 1, 2021), https://www.thelancet.com/article/S2213-2600(21)00160-0/fulltext (last visited October 18, 2021).
[39] ClinicalTrials.gov, *STerOids in COVID-19 Study (STOIC)* (February 8, 2021), https://clinicaltrials.gov/ct2/show/NCT04416399 ; *see also,*
The Lancet Respiratory Medicine, *Inhaled budesonide in the treatment of early COVID-19 (STOIC): a phase 2, open-label, randomized controlled trial* (April 9, 2021), https://www.thelancet.com/article/S2213-2600(21)00160-0/fulltext.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

### iv. Monoclonal Antibodies are Effective

71. Monoclonal antibodies are approved for COVID early treatment and are highly effective and universally safe.

### F. The COVID Vaccines are Harming Many Recipients

72. The long-established CDC database VAERS (Vaccine Adverse Events Reporting System) demonstrates significantly higher reports of deaths and adverse events with the COVID vaccines than with prior vaccines.[40] There are reports of neurological adverse events, including Guillain-Barre, Bell's Palsy, Transverse Myelitis, Paralysis, Seizure, Stroke, Dysstasia, Aphasia, and Tinnitus, as well as cardiovascular events such as clot and cardiac arrest.

## FACTUAL ALLEGATIONS SPECIFIC TO THE INDIVIDUAL PLAINTIFFS

73. Plaintiffs reallege all allegations as set forth elsewhere in this Complaint as if fully set forth herein.

74. The individual Plaintiffs are all employees of LAUSD who are directly affected by the Mandate and are imminently threatened with termination as a result thereof.

75. Plaintiff Miguel Sotelo has worked as an Electrician for LAUSD for 6 years. He is a single father with three children, aged 3, 15, and 19. His 3-year old daughter has special needs. He has been away from work due to an on-the-job injury. He must wait six months for surgery, and then will have six months of rehabilitative therapy after that before he can be cleared for work. He did not apply for an exemption because he was told that personnel who cannot work remotely will not be

---

[40] Jessica Rose, *Critical Appraisal of VAERS Pharmacovigilance: Is the U.S. Vaccine Adverse Events Reporting System (VAERS) a Functioning Pharmacovigilance System?, Science, Public Health Policy, and the Law* https://cf5e727d-d02d-4d71-89ff-9fe2d3ad957f.filesusr.com/ugd/adf864_0490c898f7514df4b6fbc5935da07322.pdf (last visited October 18, 2021), *see also,* Center for Disease Control and Prevention, *About the Vaccine Adverse Event Report System (VAERS),* https://wonder.cdc.gov/vaers.html.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

accommodated, and that he therefore faces termination, regardless of his ability to obtain an exemption.

76.    Plaintiff Mariel Howsepian is in her 18th year as a teacher for LAUSD, where she is currently employed as a technology coordinator and computer lab teacher at a science magnet school. She also works on the school yearbook, troubleshoots technology issues for other teachers, and checks out devices to students. Ms. Howsepian is the sole breadwinner for her family, as her husband stays at home with the couple's gifted daughter. She chose to work through COVID with no extra pay to assist students. Ms. Howsepian opposes being vaccinated due to her sincerely-held religious beliefs, which include opposition to abortion and the use of aborted fetal cell tissue in medications such as the COVID vaccines. She applied for a religious exemption to the Mandate, which was purportedly accepted; however, she was told that there was no available accommodation for her type of position, rendering her religious exemption illusory. She was then told that she might be able to transfer to City of Angels Online Academy ("COF") at a reduced salary. She applied but has heard nothing. Meanwhile, the deadline for compliance means that she is imminently threatened with termination.

77.    Plaintiff Jeffrey Fuentes has been employed by LAUSD as an Electrician for 8 years. He is opposed to being administered the COVID vaccine due to his sincerely-held religious beliefs, which include the use of medicines that have been derived from aborted fetal tissue. Mr. Fuentes applied for a religious exemption, which he was told was accepted; however, he has received nothing in writing, and his supervisors and superiors have repeatedly told him that there are no accommodations for his classification of employment, thus rendering his religious exemption illusory. Absent an accommodation, he faces imminent termination.

78.    Plaintiff Sandra Garcia has been an employee with LAUSD for 10 years and works as a Special Education Assistant at a middle school. She is married and has a 4-year old son. Ms. Garcia objects to being vaccinated against COVID due to her

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

sincerely-held religious beliefs, as the COVID Vaccines are made using aborted fetal cells. She applied for a religious exemption, which was granted, but she was denied an accommodation, thus rendering the exemption illusory and placing in imminent peril of being terminated. Beyond her religious beliefs, Ms. Garcia has concerns about the safety of the vaccines. For example, the teenaged son of one of her acquaintances developed myocarditis from being vaccinated.

79.    Plaintiff Hovhannes Saponghian has been employed by LAUSD for two years as a Teacher Assistant. Mr. Saponghian objects to vaccination on religious grounds because of the use of aborted fetal cell tissue in making them. He applied for a religious exemption, which was granted, but he was denied an accommodation, thus rendering the exemption illusory. He also has concerns about short-term side effects, such as death, myocarditis, and blood clots, as well as long-term side effects, which remain unknown. He is in imminent peril of termination.

80.    Plaintiff Norma Brambila is a healthcare assistant at LAUSD. She objects to vaccination on religious grounds because of the use of aborted fetal cell tissue in making them and therefore applied for a religious exemption. LAUSD acknowledged that her beliefs were genuine but refused to accommodate her. She will be paid up until October 31st and will be placed on unpaid leave starting November 1st. Plaintiff Brambila has recently recovered from COVID and now has natural immunity. However, she has been informed that medical exemptions are only available for disability or serious medical conditions. Natural immunity is neither a disability nor serious medical condition.

81.    All conditions precedent to this action have been performed, excused, and/or waived.

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

# FIRST CAUSE OF ACTION

## VIOLATION OF THE FOURTEENTH AMENDMENT

## SUBSTANTIVE DUE PROCESS -- 42 U.S.C. § 1983

### (Plaintiffs Against All Defendants)

82.     Plaintiffs reallege all allegations set forth elsewhere in this Complaint as if fully set forth herein.

83.     The Vaccine Mandate violates the liberty protected by the Fourteenth Amendment to the Constitution, which includes rights of personal autonomy, self-determination, bodily integrity and the right to reject medical treatment.

84.     The COVID vaccines are not vaccines, as that term has traditionally been understood, but are, as a factual matter, treatments. They are referred to herein as vaccines, but they are not. They are treatments. Indeed, the CDC even recently changed its own definitions of "Vaccine" and "Vaccination" to eliminate the word, "immunity."

85.     The ability to decide whether to accept or refuse medical treatment is a fundamental right.

86.     Accordingly, the Vaccine Mandate violates Plaintiffs' constitutional right to decisional privacy with regard to medical treatment.

87.     Because the COVID vaccines are not treatments, and not vaccines, strict scrutiny applies. The US Supreme Court has recognized a "general liberty interest in refusing medical treatment." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278, 110 S. Ct. 2841, 2851, 111 L.Ed.2d 224, 242 (1990). It has also recognized that the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. *Washington v. Harper*, 494 U.S. 210, 229, 110 S. Ct. 1028, 1041, 108 L.Ed.2d 178, 203 (1990), see also *id*. at 223 (further acknowledging in dicta that, outside of the prison context, the right to refuse treatment would be a "fundamental right" subject to strict scrutiny).

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

88.     As mandated medical treatments are a substantial burden, Defendants must prove that the Vaccine Mandate is narrowly tailored to meet a compelling interest.

89.     No such compelling interest exists because, as alleged above, the COVID vaccines are not effective against the now dominant Delta variant of COVID in that they do not prevent the recipient from becoming infected, getting reinfected, or transmitting COVID to others. Indeed, evidence shows that vaccinated individuals have more COVID in their nasal passages than unvaccinated people do. The Delta variant is the current variant and accounts for over 90% of the COVID infections in the United States at this time.

90.     The COVID vaccines may have been somewhat effective against the original COVID strain, but that strain has come and gone, and the COVID vaccines—designed to fight yesterday's threat—are simply ineffective against the current Delta variant.

91.     Since the COVID vaccines are ineffective against the Delta variant, there can be no compelling interest to mandate their use at this time.

92.     But even if there were a compelling interest in mandating the COVID vaccinations, the Vaccine Mandate is not narrowly tailored to achieve such an interest.

93.     The blanket Mandate ignores individual factors increasing or decreasing the risks that the plaintiffs—indeed, all LAUSD employees—pose to themselves or to others.

94.     Defendants entirely disregard whether employees have already obtained natural immunity despite the fact that natural immunity does actually provide immunity whereas the COVID vaccines do not.

95.     Treating all employees the same, regardless of their individual medical status, risk factors, and natural immunity status is not narrowly tailored.

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

24

96.     Indeed, even if the test set forth in Jacobson was the appropriate standard, which it is not, the Vaccine Mandate would still fail to satisfy that standard for the reasons set forth above.

97.     "[I]f a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Jacobson v. Massachusetts*, 197 U.S. 11, 31, 25 S. Ct. 358, 363, 49 L.Ed. 643 (1905).

98.     As set forth more fully above, the risk of death from COVID is extremely low.

99.     The available vaccines for COVID generally do not confer sterile immunity. Rather, they simply lessen the severity of symptoms for individuals who receive them. They are actually a prophylactic treatment for COVID and not a vaccine at all.

100.    COVID vaccines cripple the immune systems of some of those to whom they are administered and also create vaccine-based dependencies.

101.    Assuming for the purposes of argument that PCR tests are effective, then an adequate alternative to vaccination exists.

102.    Given these facts, as more fully set forth above, the Vaccination Mandate has no real or substantial relation to public health or is beyond all question, a plain, palpable invasion of rights secured by the fundamental law. Alternatively, the Vaccination Mandate has no real or substantial relation to public health or is beyond all question, a plain, palpable invasion of rights secured by the fundamental law as to those Plaintiffs with natural immunity. It is therefore unconstitutional regardless of which standard of review is applied.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

103.   Pursuant to 42 U.S.C. § 1983 and other applicable law, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing the Vaccine Mandate.

104.   Pursuant to 28 U.S. Code §§ 2201-02 and other applicable law, Plaintiffs are entitled to a declaration that the Vaccine Mandate is unlawful and any further relief which may be appropriate.

**SECOND CAUSE OF ACTION**

**Violation of Fourteenth Amendment**

**Equal Protection -- 42 U.S.C. § 1983**

**(Plaintiffs Against All Defendants)**

105.   Plaintiffs reallege and incorporate by reference their allegations in each of the preceding paragraphs of the Complaint as if fully alleged herein.

106.   The Equal Protection Clause prohibits classifications that affect some groups of citizens differently than others. (*Engquist v. Or. Dept. of Agric.* (2008) 553 U.S. 591, 601.) The touchstone of this analysis is whether a state creates disparity between classes of individuals whose situations are arguably indistinguishable. (Ross v. Moffitt (1974) 417 U.S. 600,609.)

107.   The Mandate creates two classes of LAUSD employees; vaccinated and unvaccinated, as well as employees who have reported their vaccination status to LAUSD and those who have not. The members of one class, the unvaccinated, get terminated. The same is true for the non-reporting class irrespective of vaccination status. In either event they cannot advance their careers.  They cannot provide for their families, pay their mortgages, or make a car payment. The other class, the vaccinated and reporting, gets to keep their job in their chosen profession, advance their careers, provide for their families, pay their mortgages, and make their car payments.

108.   Yet the situations of these employees are indistinguishable because vaccinated and reporting LAUSD employees can become infected with COVID,

26

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

become re-infected with COVID, and can transmit COVID to fellow employees, school visitors, and students. The vaccines make no difference in these respects. Their only function is to make symptoms less severe.

109.   Discriminating against the unvaccinated and non-reporting controverts the goals of the Equal Protection Clause – i.e., to abolish barriers presenting unreasonable obstacles to advancement on the basis of individual merit.

110.   Pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing the Vaccine Mandate.

## THIRD CAUSE OF ACTION

### Declaratory and Injunctive Relief under Cal. Constitution

### (Plaintiffs Against All Defendants)

111.   Plaintiffs reallege and incorporate by reference their allegations in each of the preceding paragraphs of the Complaint as if fully alleged herein.

112.   The Plaintiffs are employed by LAUSD. They have not complied with LAUSD's Mandate, including reporting of their vaccination status. They object to being compelled to turn over their private medical information to LAUSD as a condition of their continued employment.

113.   Individuals have a right to privacy under the California Constitution. This state law privacy right, which was added by voters in 1972, is far broader than the right to privacy under the federal Constitution. It is the broadest privacy right in America and has been interpreted by the California Supreme Court to protect both the right to informational privacy and to bodily integrity.

114.   LAUSD employees have a legally protected privacy interest not just in their bodily integrity, but their private medical information as well. Their expectation of privacy is reasonable. LAUSD's Mandate constitutes a serious invasion of those privacy rights, as alleged above.

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

27

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

115.   Although LAUSD may argue that the vaccine mandate serves a compelling interest, there are feasible and effective alternatives that have a lesser impact on privacy interests. Thus, LAUSD's mandate will not survive strict scrutiny.

116.   On information and belief, LAUSD contends that its mandate does not violate the privacy rights of LAUSD employees or satisfies strict scrutiny.

117.   Plaintiffs desire a judicial declaration that LAUSD's Mandate is facially unconstitutional because it violates LAUSD's employees' right to privacy under the California Constitution.

118.   A judicial determination of these issues is necessary and appropriate because such a declaration will clarify the parties' rights and obligations, permit them to have certainty regarding those rights and potential liability, and avoid a multiplicity of actions.

119.   LAUSD's actions have harmed Plaintiffs among other LAUSD employees, as alleged above.

120.   Plaintiffs have no adequate remedy at law and will suffer irreparable harm if the Court does not declare the Mandate unconstitutional. Thus, they seek preliminary and permanent injunctive relief enjoining LAUSD from enforcing the mandate.

121.   This action serves the public interest, justifying an award of attorneys' fees under section 1021.5 of the California Code of Civil Procedure.

## FOURTH CAUSE OF ACTION

**Declaratory and Injunctive Relief under Americans with Disabilities Act**
**42 USC §§ 12101, *et seq*. – Disparate Treatment and Failure-To-Accommodate**
**(Plaintiffs Against Defendants)**

122.   Plaintiffs reallege and incorporate by reference their allegations in each of the preceding paragraphs of the Complaint as if fully alleged herein.

123.   Defendants' enforcement of the Mandate through termination of non-compliant Plaintiffs without engaging in an interactive process with each employee to

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

identify and implement appropriate reasonable accommodations enabling the employee to perform their job duties directly violates, and conflicts with, their duties and obligations under the Americans with Disabilities Act ("ADA"). 42 USC §§ 12101, et seq.

124. Defendants have threatened to, and in several instances have, placed Plaintiffs on administrative leave and threatened termination from their employment because of Defendants' belief that Plaintiffs' physical condition of being unvaccinated and/or having failed to report their vaccination status makes them incapable of performing the duties they have performed competently for nearly two years since the COVID pandemic first appeared.

125. Defendants' mandatory vaccination is based on Defendants' perception that those who are unvaccinated present a danger of infection to themselves from contact with others and a danger to others from contagion. As a consequence, it is apparently Defendants' view that without the safety of vaccination and reporting the Plaintiffs are not capable of performing their work by reason of their physical condition and thus are regarded as being disabled.

126. Defendants' threat to terminate the Plaintiffs' employment by reason of their physical condition constitutes discrimination on the basis of a perception of disability in violation of the ADA, 42 USC 126. See, §§ 12102(3) (forbidding discrimination on the basis of a person being regarded as having an impairment); and § 12112 (forbidding any impairment in the terms of employment of an individual on the basis of a perception of impairment.)

127. Further Plaintiffs are qualified individuals with a disability, because they remain able, with or without reasonable accommodation, to perform the essential functions of the employment position that Plaintiffs hold, as demonstrated by the fact Plaintiffs' have performed their essential job functions competently for nearly two years

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

1   since the COVID pandemic first appeared and, in many instances, continued those

2   operations without cessation during worst of the pandemic as essential workers.

3       128.   Further, assuming for the sake of argument, Plaintiffs become  unable to

4   perform their essential job functions by virtue Defendants' perception that as of the

5   arbitrary and capricious deadlines specified in the Mandate unvaccinated and/or non-

6   reporting employees then present a danger of infection to themselves from contact with

7   others and a danger to others from contagion, there exists an abundance of reasonable

8   accommodations designed to mitigate the risk of contagion that LAUSD implemented,

9   and relied on, such as remote work, social distancing, erection of transparent barriers,

10  face masking, alternate shifts to alleviate crowding in the work place, advanced cleaning

11  protocols, and efforts to improve ventilation, among other things.

12      129.   An actual controversy involving justiciable questions related to this

13  controversy exists related to the rights and obligations of the respective parties with

14  respect to the ADA.

15      130.   Plaintiffs seek a judicial declaration that proceeding with the imposition of

16  the threatened employment sanctions is a violation of the ADA and seek an order

17  restraining and enjoining Defendants from violation of the ADA by employment

18  sanction on the basis of perceived physical disability.

## **FIFTH CAUSE OF ACTION**

**Violation of Due Process – *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194**

**(Plaintiffs Against all Defendants)**

22      131.   Plaintiffs reallege and incorporate by reference their allegations in each of

23  the preceding paragraphs of the Complaint as if fully alleged herein.

24      132.   Defendants have suspended various LAUSD employees, including

25  Plaintiffs by placing them on administrative leave for failure to comply with the

26  Mandate.

27

28

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

133.   Under *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 and its progeny Plaintiffs have a property interest in continued employment with LAUSD protected by due process.

134.   On information and belief, LAUSD contends that it does not have to afford Plaintiffs a full and complete Skelly hearing and rights and has instead suspended its employees administratively including the Plaintiffs for five days or more, without a hearing within a reasonable time thereafter and providing written notice explaining: (i) the charge; (ii) proposed discipline; (iii) the policy or rule violated; (iv) the factual basis for the same; (v) produced the documents purporting to support the charge(s); (vi) containing a date for an in-person hearing; and (vii) the deadline for any response.

135.   An actual controversy involving justiciable questions related to this controversy exists related to the rights and obligations of the respective parties with respect to Plaintiffs' and LAUSD employees' rights under *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 and its progeny.

136.   Plaintiffs seek a judicial declaration that proceeding with the imposition of the threatened employment sanctions is a violation of *Skelly* and seek an order restraining and enjoining Defendants from proceeding with the imposition of the threatened employment sanctions before affording due process under *Skelly*.

## SIXTH CAUSE OF ACTION

### Public Disclosure of Private Facts

### (Plaintiffs Against all Defendants)

137.   Plaintiffs reallege and incorporate by reference their allegations in each of the preceding paragraphs of the Complaint as if fully alleged herein.

138.   Defendants received private, biological and genetic information from Plaintiffs by requiring biological tests preparatory for requiring mandatory vaccination as a condition of retained employment. Defendants disclosed the information derived from said tests to Fulgent under a contract that enabled Fulgent to utilize blockchain

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

technology to keep, retain and share said information to unlimited persons and companies unknown, including governmental agencies, without the knowledge, permission or consent of the Plaintiffs. The information derived by the Defendants and disclosed to Fulgent and, through Fulgent, publicly to thousands of persons and companies unknown to Plaintiffs, was private and intended to be kept so, the disclosure of which would be highly offensive to persons of normal sensibility.

139.    Defendants knew or acted with reckless disregard of the fact that the disclosure and dissemination of said information would be highly offensive and damaging to the Plaintiffs and, disregarding their duty, disclosed same.

140.    The information Defendants disclosed was not information of legitimate concern to those who received it and those to whom it was disseminated.

141.    As a result of the Defendants' conduct as herein alleged, Plaintiffs have been harmed and injured to an extent that has not, as yet, been fully quantified. Plaintiffs will seek leave to amend this complaint to allege the full extent of said damage when same has been fully ascertained.

142. Plaintiffs seek a judicial declaration that Defendants violated Plaintiffs' privacy with  regard to their medical information and will seek an order restraining and enjoining Defendants from maintaining or disseminating LAUSD employees' medical information, including through a third party, Fulgent.

## SEVENTH CAUSE OF ACTION
### Breach of Security for Computerized Personal Information
### (Plaintiffs Against all Defendants)

143.    Plaintiffs reallege and incorporate by reference their allegations in each of  the preceding paragraphs of the Complaint as if fully alleged herein.

144.    Defendants own computerized data, specifically genetic and medical data related to the Plaintiffs herein, that was represented to be private and protected. In violation of the Defendants' duties under California Civil Code 1798.29 and 1798.82,

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

32

Defendants allowed said information to be shared with Fulgent that disclosed same to unknown millions of people and organizations through the use of blockchain technology and pursuant to a contract with LAUSD that allowed it to do so.

145.   Defendants knew or acted with reckless disregard of the fact that the disclosure and dissemination of said information would be highly offensive and damaging to the Plaintiffs and, disregarding their duty, disclosed the same.

146.   The information Defendants disclosed was not information of legitimate concern to those who received it and those to whom it was disseminated.

147.   As a result of the Defendants' conduct as herein alleged, Plaintiffs have been harmed and injured to an extent that has not, as yet, been fully quantified. Plaintiffs will seek leave to amend this complaint to allege the full extent of said damage when same has been fully ascertained.

148.   Plaintiffs seek a judicial declaration that Defendants' violated Plaintiffs' privacy by disseminating their medical information to Fulgent and seek an order restraining and enjoining Defendants from maintaining or disseminating LAUSD employees' medical information, including through a third party, Fulgent.

## **PRAYER**

Wherefore, Plaintiffs pray for judgment in their favor and against Defendants as follows:

## **ON THE FIRST CAUSE OF ACTION**

1.   Temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing the Mandate; and

2.   For reasonable attorneys' fees.

## **ON THE SECOND CAUSE OF ACTION**

1.   Temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing the Vaccine Mandate; and

2.   For reasonable attorneys' fees.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

**ON THE THIRD CAUSE OF ACTION**

1.      A judicial declaration that LAUSD's Mandate is facially unconstitutional because it violates Plaintiffs' and LAUSD employees' right to privacy under the California Constitution; and

2.      Preliminary and permanent injunctive relief enjoining LAUSD from enforcing the Mandate.

**ON THE FOURTH CAUSE OF ACTION**

1.      A judicial declaration that proceeding with the imposition of the threatened employment sanctions is a violation of the ADA; and

2.      An order restraining and enjoining Defendants from violation of the ADA by employment sanction on the basis of perceived physical disability.

**ON THE FIFTH CAUSE OF ACTION**

1.      A judicial declaration that proceeding with the imposition of the threatened employment sanctions is a violation of *Skelly*; and

2.      An order restraining and enjoining Defendants from proceeding with the imposition of the threatened employment sanctions before affording due process under *Skelly*.

**ON THE SIXTH CAUSE OF ACTION**

1.  A judicial declaration that Defendants violated Plaintiffs' privacy with regard to their medical information; and

2.  An order restraining and enjoining Defendants from maintaining or disseminating LAUSD employees' medical information, including through a third party, Fulgent.

**ON THE SEVENTH CAUSE OF ACTION**

1.  A judicial declaration that Defendants' violated Plaintiffs' privacy by disseminating their medical information to Fulgent; and

2.  An order restraining and enjoining Defendants from maintaining or

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

disseminating LAUSD employees' medical information, including through a third party, Fulgent.

**ON ALL CAUSES OF ACTION**

1.  For judgment in favor of Plaintiffs;

2.  For costs of suit herein; and

3.  For such other and further relief as the Court may deem just and proper.

Dated: November 2, 2021                    JW HOWARD/ATTORNEYS

/s/ John W. Howard
John W. Howard
Attorney for Plaintiffs

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a right to a jury trial for all matters so triable.

Dated: November 2, 2021                    JW HOWARD/ATTORNEYS

/s/ John W. Howard
John W. Howard
Attorney for Plaintiffs

JW HOWARD/ ATTORNEYS, LTD.
701 B STREET, SUITE 1725
SAN DIEGO, CALIFORNIA 92101

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
DECLARATORY AND INJUNCTIVE RELIEF