Robert H. Tyler, Esq., CA Bar No. 179572
btyler@faith-freedom.com
**ADVOCATES FOR FAITH & FREEDOM**
25026 Las Brisas Road
Murrieta, California 92562
Telephone:   (951) 600-2733
Facsimile:    (951) 600-4996

Brant C. Hadaway (*Pro Hac Vice*)
bhadaway@davillierlawgroup.com
**HADAWAY, PLLC**
2425 Lincoln Ave.
Miami, Florida 33133
Telephone:   (305) 389-0336

George R. Wentz, Jr. (*Pro Hac Vice*)
gwentz@davillierlawgroup.com
**DAVILLIER LAW GROUP, LLC**
935 Gravier Street, Ste. 1702
New Orleans, LA 70112
Telephone:(504) 458-7143

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **HEALTH FREEDOM DEFENSE FUND, INC.,** a Wyoming Not-for-Profit Corporation**; CALIFORNIA EDUCATORS FOR MEDICAL FREEDOM,** an unincorporated association**; MIGUEL SOTELO; JEFFREY FUENTES; SANDRA GARCIA; HOVHANNES SAPONGHIAN; and NORMA BRAMBILA,**<br><br>                    Plaintiffs,<br>          v.<br><br>**ALBERTO CARVALHO**, in his official capacity as Superintendent of the Los Angeles Unified School District; **ILEANA DAVALOS**, in her official capacity as Chief Human Resources Officer for the Los Angeles Unified School District; **GEORGE MCKENNA**, **MÓNICA GARCÍA,** | Case No.:  2:21-cv-08688-DSF-PVC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>**Date:  September 12, 2022**<br>**Time: 1:30 pm**<br>**Courtroom: 7D**<br><br><br>Judge: Hon. Dale S. Fischer |

i

1  **SCOTT SCHMERELSON, NICK**
2  **MELVOIN, JACKIE GOLDBERG,**
   **KELLY GONEZ**, and **TANYA**
3  **ORTIZ FRANKLIN**, in their official
   capacities as members of the Los
4  Angeles Unified School District
   governing board,
5                    Defendants.

6          Plaintiffs HEALTH FREEDOM DEFENSE FUND, INC., CALIFORNIA

7  EDUCATORS FOR MEDICAL FREEDOM, MIGUEL SOTELO, JEFFREY FUENTES,

8  SANDRA GARCIA, HOVHANNES SAPONGHIAN, and NORMA BRAMBILA

9  ("Plaintiffs") respectfully submit this Memorandum In Opposition to Defendants

10 ALBERTO CARVALHO, ILEANA DAVOLOS, GEORGE MCKENNA, MONICA

11 GARCIA, SCOTT SCHMERELSON, NICK MELVOIN, JACKIE GOLDBERG, KELLY

12 GONEZ AND TANYA ORTIZ FRANKLIN ("Defendants") Motion for Judgment on the

13 Pleadings, ECF 74.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

# <u>TABLE OF CONTENTS</u>

**PAGE**

I.    INTRODUCTION……………………………………………...……………………1

II.   FACTS AND PROCEDURAL HISTORY……...……………………………..3

III.  LEGAL STANDARD……………………………………………..4

IV.   LEGAL ARGUMENT……………………………………………………4

    A.   Defendants Are Not Immune in their Official Capacities…………………..4

        1.   Plaintiffs' Claims Fit Squarely within *Ex Parte Young*……………...4

        2.   Plaintiffs Have Not Alleged Claims Against Defendants in their Individual Capacities……………………………………………...……8

        3.   Defendants Are Amenable to Suit Under § 1983 in their Official Capacities……………………………………………..8

        4.   Plaintiffs Agree to Dismissal of their State Law and ADA Claims, Without Prejudice……………………………………………….9

    B.   Plaintiffs Allege Sufficient Facts in Support of their Claim For Violation of Substantive Due Process Under the 14th Amendment……………………..9

        1.   The SAC Sufficiently Alleges a Substantive Due Process Right Against Unwanted Medical Treatment………………………..……...9

        2.   The Mandate Substantially Burdens and Interferes with Plaintiffs' Fundamental Substantive Due Process Right to Refuse Medical Treatment……………………………………………………17

        3.   The Mandate Does Not Serve the District's Claimed Interest and, Even If It Did, It Is Not Narrowly Tailored…………………….....18

    C.   Plaintiffs Sufficiently State a Claim For Violation of Equal Protection Under the Fourteenth Amendment……………………………...……………...22

V.    CONCLUSION…………………………………………………..24

1

# <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                                           **Page**

3

*Am. Fire, Theft & Collision Mngrs., Inc. v. Gillespie,*

4
     932 F.2d 816 (9th Cir. 1991)………………………………………………………5

5

*Ariz. Students' Ass'n. v. Ariz. Bd. of Regents,*

6
     824 F.3d 858 (9th Cir. 2016)………………………………………………………4

7

*Barren v. Harrington,*

8
     152 F.3d 1193 (9th Cir. 1998)………………………………………………………..8

9

*Benson v. Terhune,*

10
     304 F.3d 874 (9th Cir. 2002)………………………………………………………...10

11

*Brown v. Smith,*

12
     24 Cal. App. 5th 1135 (2018)………………………………………………………..23

13

*Cal. Educators for Medical Freedom, et al. v. The Los Angeles Unified Sch. Dist. et al.*

14
*("CEMF I"),*

15
     Case No. 21-cv-02388 (C.D. Cal. 2021)………………………………………...3, 6

16

*Commonwealth. v. Jacobson,*

17
     66 N.E. 719 (Mass. 1903)………………………………………………………11

18

*Cruzan v. Dir., Mo. Dep't of Health,*

19
     497 U.S. 261 (1990)……………………………………………………..9, 10, 17

20

*Doe v. Lawrence Livermore Nat'l Lab.,*

21
     131 F.3d 836 (9th Cir. 1997)…………………………………..…………………...7

22

*Ex Parte Young,*

23
     209 U.S. 123 (1908)………………………………………………………4, 7, 8

24

*Fowler Packing Co., Inc. v. Lanier,*

25
     844 F.3d 809 (9th Cir. 2016)………………………………………………………...24

26

*Green v. City of Tucson,*

27
     340 F.3d 891 (9th Cir. 2003)………………………………………………………22, 23

28

*Green v. Mansour*,
    474 U.S. 64 (1985)……………………………………………………………7

*HSBC Bank USA, N.A. v. Fid. Nat'l Title Ins. Co.*,
    2021 U.S. App. LEXIS 36263 (9th Cir., Dec. 9, 2021)……………………..…….4

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905)………………………………………....1, 9, 10, 11 , 12, 15, 16, 17

*Leer v. Murphy*,
    844 F.2d 628 (9th Cir. 1988)…………………………….……………………8

*Love v. State Dept. of Educ.*,
    29 Cal. App. 5th 980 (2018)……………………………………………………11

*Marder v. Lopez*,
    450 F.3d 445 (9th Cir. 2006)……………………………………………….…..4

*MGIC Indem. Corp. v. Weisman*,
    803 F.2d 500 (9th Cir. 1986)……………………………………………...12

*Parham v. J. R.*,
    442 U.S. 584 (1979)……………………………………………………………18

*Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*,
    522 F.3d 1049 (9th Cir. 2008)……………………………………………...4

*Soria v. Stabler & Assocs.*,
    2020 U.S. Dist. LEXIS 247325 (C.D. Cal., Sept. 20, 2020)………………………4

*Stanley v. Trustees of Cal. State Univ.*,
    433 F.3d 1129 (9th Cir. 2006)……………………………………………………4

*Tsao v. Desert Palace, Inc.*,
    698 F.3d 1128 (9th Cir. 2012)……………………………………………..8

*U.S . v. Lee*,
    957 F.2d 778 (10th Cir. 1992)……………………………………………22

*Valenzuela v. Arpaio*,
    770 F.3d 772 (9th Cir. 2014)……………………………………………...21-22

*Vitek v. Jones*,
    445 U.S. 480 (1980)……………………………………………………18

*Washington v. Harper*,
    494 U.S. 210 (1990)………………………………………………...10, 18

*Washington v. Glucksberg*,
    521 U.S. 702 (1997)…………………………………………..10, 17, 18, 22

*Whitlow v. California*,
    203 F. Supp. 3d 1079 (S.D. Cal. 2016)………………………………...23

*Will v. Michigan Dep't of State Police*,
    491 U.S. 58 (1989)………………………………………………………8

*Woodrum v. Woodward County*,
    866 F.2d 1121 (9th Cir. 1989)………………………………………...5


**Statutes**

42 U.S.C. § 1983………………………………………………………8


**Other Authorities**

Eleventh Amendment, U.S. Const……………………………………...4, 5

Fourteenth Amendment, U.S. Const…………………….....1, 2, 5, 9, 10, 18, 22, 24

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

# I.    INTRODUCTION

Fully vaccinated and double-boosted, the President of the United States nevertheless contracted COVID-19. He was not alone. Across the country, millions of people who either believed in good faith that the COVID vaccines would protect them from infection, or who simply acquiesced to compulsion from their employers, are discovering that these "vaccines" have not prevented the spread of COVID-19.

The reason is simple but often overlooked: The available COVID "vaccines" were never designed to prevent infection or transmission of SARS-CoV-2 (the pathogen that causes COVID-19), but only to reduce the severity of disease in an infected recipient. While public health officials *hoped* that the vaccines might prevent infection or transmission, it has not worked out that way, especially as the virus continues to mutate into new variants and subvariants. The U.S. Centers for Disease Control and Prevention ("CDC") tacitly admitted as much when, last year, it quietly changed its definitions of "Vaccine" and "Vaccination" to eliminate the word "immunity" from both.

But without sterilizing immunity, which would prevent infection and transmission, "vaccination" no longer means what the Supreme Court understood it to mean when it upheld a mandate for vaccination against smallpox in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). Thus, the traditional public health justification for mandating vaccination— what the *Jacobson* Court called "the common good"—cannot be invoked to justify mandatory administration of the available COVID vaccines.

To the contrary, because the COVID vaccines were only intended to reduce symptomatic disease in the infected recipient, they bear greater resemblance to therapeutic medicine—i.e., medical treatment. And the Supreme Court has repeatedly held that we each have a substantive due process right to refuse unwanted medical treatment, no matter how well-intended, even if it is meant to save our lives. As such, strict scrutiny applies to the Los Angeles Unified School District's policy requiring that its employees be vaccinated against COVID-19 (the "Mandate") under both the substantive due process and equal protection provisions of the Fourteenth Amendment.

1

The Mandate fails strict scrutiny in at least two respects. First, because the COVID vaccines lack efficacy to prevent the spread of COVID-19, the Mandate fails to advance a compelling interest of LAUSD. Second, even if LAUSD had a compelling interest in forcing its employees to accept administration of the vaccines, the Mandate is not narrowly tailored to serve that interest because it fails to recognize (1) that natural immunity has been proven to be at least equal if not superior to vaccine-induced "immunity," and (2) the increasing availability of therapeutics to treat COVID symptoms, which have significantly better safety profiles than the COVID vaccines, themselves.

Thus, Plaintiffs adequately state a claim for violation of substantive due process under the Fourteenth Amendment. For largely the same reasons, Plaintiffs adequately state a claim for violation of equal protection. Segregating Plaintiffs, and depriving them of their chosen professions, based on their "vaccination" status cannot be justified under strict scrutiny. For the naturally immune, such disparate treatment cannot even survive rational basis review. Even CDC, in its latest guidance, recognizes that there is no reason to treat the unvaccinated any different than the vaccinated. Accordingly, Defendants' Motion for Judgment on the Pleadings (the "Motion") must be denied as to Plaintiffs' First and Second Causes of Action (Plaintiffs have agreed to dismissal without prejudice of their Third through Seventh Causes of Action).

The balance of Defendants' Motion is utterly devoid of merit. Plaintiffs have repeatedly emphasized that they are not seeking damages, but only prospective relief against Defendants in their official capacities. The deprivation of Plaintiffs' rights remains ongoing, as their ability to return to work for LAUSD hinges on compliance with the Mandate. In the alternative, Plaintiffs have the option of seeking prospective relief in the form of an injunction requiring that they be reinstated to their positions.

Thus, Plaintiffs have brought viable Section 1983 claims against Defendants in their official capacities for their ongoing violations of Plaintiffs' fundamental constitutional rights protected by the Fourteenth Amendment of the United States Constitution. Defendants' Motion should be denied.

## II.    FACTS AND PROCEDURAL HISTORY

Plaintiff California Educators for Medical Freedom ("CEMF"), together with several individual plaintiffs, filed suit against representatives of LAUSD on March 17, 2021. *See CEMF I*, Case No. 21-cv-02388. In *CEMF I*, the plaintiffs alleged that LAUSD had decided to mandate "vaccination" against COVID-19 as evidenced by a series of instructions to employees, comments from union leaders, and interoffice memoranda from LAUSD's personnel department. *See CEMF I*, at Pls. Compl., ECF 1, ¶¶73-81. The plaintiffs filed a motion for preliminary injunction that sought to prohibit enforcement of the mandate. *Id*. at ECF 13.

In their motion for preliminary injunction, the plaintiffs disclosed to the Court that, the day after the *CEMF I* complaint was filed, LAUSD put out a new memorandum claiming that "vaccinations [were] not mandatory *at [that] time*." *Id*. at ECF 13-9 (emphasis added). However, based on first-hand reports from multiple sources (*id*. at ECF 13-7 – Decl. of A. Quintero and exhibits thereto) the plaintiffs knew that a vaccination mandate was imminent and, while withdrawing their motion for preliminary injunction— *id*. at ECF 21—they filed an Amended Complaint seeking to prohibit enforcement of the impending mandate—*id*. at ECF 25.

LAUSD moved to dismiss, arguing that the claims were not ripe because LAUSD had not in fact mandated vaccination of its employees. *Id*. at ECF 33-1 at 5-7. LAUSD argued that the plaintiffs had raised "no allegation of any personnel decisions resulting from the alleged mandate that affect[ed] Plaintiffs." *Id*. at 6. As LAUSD put it at the time (notably, in passive voice), "***[T]here is no such mandate***." *Id*. at 7. In good-faith reliance on that representation, this Court granted dismissal on July 27, 2021. *Id*. at ECF 44.

However, a mere 17 days after winning dismissal based on their claim that "*there is no such mandate*," Defendants (re)enacted the Mandate. *See* Plaintiffs' SAC in the Instant Case, ECF 65, at ¶4 and Ex. "A". This action followed.

## III.    LEGAL STANDARD

As Defendants acknowledge, "a motion for judgment on the pleadings is 'functionally identical' to a motion to dismiss," and thus the standard "is essentially the same as for a Rule 12(b)(6) motion." Defs. Memo In Supp., ECF 74-1, at 4 (citing *Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1052 n.1 (9th Cir. 2008)). Thus, as this Court has noted, judgment on the pleadings is "proper when, taking all allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." *Soria v. Stabler & Assocs.*, Case No. 19-1976, 2020 U.S. Dist. LEXIS 247325, *2 (C.D. Cal., Sept. 20, 2020) (citing *Stanley v. Trustees of Cal. State Univ.*, 433 F.3d 1129, 1133 (9th Cir. 2006)). "It must appear beyond doubt that the plaintiff can prove no set of facts that would entitle it to relief." *Id*. (citation omitted).

As when ruling on a motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint." *Id*. at *2-3. It follows that a court must limit its analysis to the four corners of the complaint. *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). All inferences must be drawn in favor of the non-moving party. *See, e.g., HSBC Bank USA, N.A. v. Fid. Nat'l Title Ins. Co.*, Case No. 20-15387, 2021 U.S. App. LEXIS 36263, *2 (9th Cir., Dec. 9, 2021).

## IV.    LEGAL ARGUMENT

### A.    Defendants Are Not Immune in their Official Capacities.

#### 1.    Plaintiffs' Claims Fit Squarely within *Ex Parte Young*.

Defendants' Eleventh Amendment argument relies on speculation about Plaintiffs' motives rather than what they have alleged. To begin, Defendants acknowledge that sovereign immunity under the Eleventh Amendment "does not bar claims against individuals sued in their official capacity seeking *prospective injunctive relief* against state officials to remedy an *ongoing violation of federal law*." ECF 74-1 at 6 (emphasis in original) (citing *Ex Parte Young*, 209 U.S. 123, 149-56 (1908) and *Arizona Students' Ass'n. v. Arizona Bd. of Regents*, 824 F.3d 858, 865 (9th Cir. 2016)). Plaintiffs agree that this is the standard but would add, for the sake of clarity, that the *Young* doctrine encompasses

4

ongoing violations of a constitutional right or a constitutionally protected liberty interest, and that the available prospective relief includes declaratory relief and "any measures ancillary to that [prospective] relief," such as an award of attorney's fees. *Ariz. Bd. of Regents*, 824 F.3d at 865 (citations omitted). *See also, e.g., Woodrum v. Woodward County*, 866 F.2d 1121, 1124-25 (9th Cir. 1989). The relief sought by Plaintiffs fits squarely within this doctrine, in that Plaintiffs have sued Defendants in their official capacities, *see* SAC, ECF 65, at ¶¶ 17-21, and have sought prospective—declaratory and injunctive—relief for ongoing violations of the Fourteenth Amendment. *See id.* at ¶¶ 99-100, 106.

Defendants nevertheless claim to have gleaned Plaintiffs' true intentions to seek damages based on the timing of, and the allegations raised in, their pleadings. ECF 74-1 at 7-8. For instance, Defendants highlight Plaintiffs' reference to damages in paragraph 22 of the SAC, claiming that this proves Plaintiffs' intention to seek damages from LAUSD—a subdivision of the state—in violation of the Eleventh Amendment. *Id.*

But paragraph 22 clearly seeks to reserve Plaintiffs' right to bring claims for damages against Defendants in their individual capacities *in the event that* discovery should reveal adequate grounds to defeat a defense of qualified immunity. *See* SAC, ECF 65, at ¶ 22; *see also* Pls. Prop. Third Am. Compl. (comparison version), attached as Exhibit "1", at ¶ 22. Such an action would be permissible under long-existing precedent, and, in any event, the defense of qualified immunity does not apply to claims for prospective relief. *See also, e.g., American Fire, Theft & Collision Mngrs., Inc. v. Gillespie*, 932 F.2d 816, 818 (9th Cir. 1991). Nevertheless, to remove all doubt, Plaintiffs offered to strike paragraph 22 from the SAC in their proposed Third Amended Complaint. *See* Exhibit "1", at ¶ 22. Defendants refused that proposal and, instead, chose to waste this Court's time by making it a point of contention in their Motion.

Defendants fault Plaintiffs for not running to this Court and seeking a preliminary injunction before they were terminated. ECF 74-1 at 7. Specifically, Defendants argue that Plaintiffs "did not file the SAC until *seven* months after they were advised of the Mandate and nearly *four* months *after* the alleged adverse employment actions were supposed to

have taken place." *Id*. This, Defendants argue, shows that "Plaintiffs are actually seeking a *retroactive* determination that the Mandate is unlawful." *Id*.

Given the history of this dispute, that is a cheeky argument. In *CEMF I*, LAUSD persuaded this Court that the plaintiffs had not alleged that "any LAUSD employee incurred an adverse employment action from refusal to be vaccinated or was directly threatened with an adverse employment action." *CEMF I*, Order (ECF 44) at 6. Based on the Court's ruling, Plaintiffs held off from re-filing this lawsuit until it became abundantly clear that LAUSD had begun to take, or was imminently taking, adverse employment action against employees of LAUSD based on their refusal to be vaccinated.[1]

Defendants also forget that they stipulated to the filing of the SAC, the reasons for which were to correct the identities of certain parties, to adapt the allegations to the developing epidemiological situation, and to simplify the issues for discovery and trial. *See* Joint Stip., ECF 63, at 2-3. If Defendants believed that it was too late to file an amended complaint at that time, they should have said so.

The fact that individually-named Plaintiffs, as well as members of Plaintiffs Health Freedom and CEMF, have since been terminated does not mean that their ability to obtain prospective relief has now lapsed. First, Plaintiffs' terminations do not mean that Defendants' violations of their rights are no longer ongoing. LAUSD has made it clear that

---

[1]   As it turned out, the first major blow fell in early December 2021, when the LAUSD Board voted to terminate nearly 500 employees of the district. *See, e.g.,* Associated Press, *Los Angeles School Board Fires 500 Unvaccinated Employees*, (Dec. 8, 2021), https://www.usnews.com/news/best-states/california/articles/2021-12-08/los-angeles-school-board-fires-500-unvaccinated-employees. Curiously, in response to Plaintiffs' interrogatories and requests for production, each Board member-defendant—George McKenna, Monica Garcia, Scott Schmerelson, Nick Melvoin, Jackie Goldberg, Kelly Gonez, and Tanya Ortiz Franklin—claimed to have had no involvement in the enforcement of the Mandate. *See*, *e.g*., Def. McKenna Rsps. to Pls. Interrog., Set One, attached as Exhibit "2"; *see also* Def. McKenna Rsps. to Pls. RFP, Set One, attached as Exhibit "3"; Def. Franklin Rsps. to Pls. Interrog., Set One, attached as Exhibit "4"; Def. Franklin Rsps. to Pls. RFP, Set One, attached as Exhibit "5".

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiffs can return to work if they agree to be vaccinated.[2] Thus, should the Court enjoin enforcement of the mandate, this precondition will no longer exist.

But even if that were not the case, Plaintiffs still have the option of seeking prospective relief in the form of an injunction requiring their reinstatement. *See Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839-42 (9th Cir. 1997). Thus, Defendants' suggestion that this lawsuit comes too late must fail.

Defendants mistakenly rely on *Green v. Mansour*, 474 U.S. 64 (1985)—ECF 74-1 at 8—for the proposition that Plaintiffs' ability to seek prospective relief has somehow lapsed. *Green* concerned two class actions brought against the director of a state department of social services, alleging that the director's "calculations of benefits under the federal Aid to Families With Dependent Children (AFDC) program violated certain provisions of that federal law." 474 U.S. at 65. But then Congress amended the law while the cases were pending, and the director brought benefits calculations in line with the amended statute. *Id*. Thus, the district court could grant no prospective relief. *Id*.

Defendants can make no such claim. First, the law has not changed. As discussed *infra*, Plaintiffs still have a substantive due process right to refuse administration of a "vaccine" that provides no sterilizing immunity and thus no real protection against infection and transmission—especially given that many Plaintiffs have recovered from COVID-19, which according to CDC's own data confers protection from the virus that is at least equal, if not superior, to vaccination.[3]

Second, the facts here remain essentially the same: Defendants continue to demand that Plaintiffs accept the risk of vaccination as the sole precondition for returning to work.[4] In other words, Defendants continue to deprive Plaintiffs of their chosen professions solely on the basis of their "vaccination" status. As such, Plaintiffs' claims fit squarely within *Ex*

---

[2] For example, Plaintiff Miguel Sotelo was rehired after he agreed to be vaccinated. *See* Settlement Agreement between M. Sotelo and LAUSD, attached as Exhibit "6". Mr. Sotelo accordingly stipulates to dismissal of his claims.

[3] *See, e.g., infra*, León TM, *et al.*, n.33.

[4] *See supra*, Exhibit "6", n.2.

*Parte Young*.

## 2. Plaintiffs Have Not Alleged Claims Against Defendants in their Individual Capacities.

Defendants argue that Plaintiffs have not made sufficient allegations of what acts each Defendant personally committed that deprived Plaintiffs of their constitutional rights. ECF 74-1 at 12-13. But this argument conflates the standard for § 1983 claims for damages against state actors in their *individual* capacities with the *Ex Parte Young* standard governing claims for prospective relief against state actors in their *official* capacities. Defendants' citations clearly address the former standard, not the latter. *See Leer v. Murphy*, 844 F.2d 628, 632-33 (9th Cir. 1988) (addressing standard for damages liability against person acting under color of law); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138 (9th Cir. 2012) (explaining standard for *liability* against individuals and organizations under § 1983); *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (holding that "*[l]iability* under § 1983 must be based on the personal involvement of the defendant.").

As previously explained, Plaintiffs are not seeking damages against Defendants, whether in their individual or official capacities. Accordingly, the Court may disregard this portion of Defendants' argument.

## 3. Defendants Are Amenable to Suit Under § 1983 in their Official Capacities.

Despite the foregoing, and despite their acknowledgment that the *Ex Parte Young* doctrine permits suits for prospective relief against state actors in their official capacities, Defendants argue that they are not "persons" under § 1983. ECF 74-1 at 13-14. This argument again implicitly raises a straw man that Plaintiffs seek damages. But Plaintiffs do not seek damages. Indeed, Defendants rely on *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989), in which the Court noted that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" 491 U.S. at n.10 (emphasis added) (citations omitted).

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

**4.     Plaintiffs Agree to Dismissal of their State Law and ADA Claims, Without Prejudice.**

The Court need not address Defendants' argument regarding dismissal of Plaintiffs' claims under the laws and Constitution of California, and under the Americans with Disabilities Act (ECF 74-1 at 16-24), as Plaintiffs have agreed to dismissal, *without prejudice*, of those claims.

**B.     Plaintiffs Allege Sufficient Facts in Support of their Claim for Violation of Substantive Due Process Under the Fourteenth Amendment.**

**1.     The SAC Sufficiently Alleges a Substantive Due Process Right Against Unwanted Medical Treatment.**

Defendants argue, in conclusory fashion, that Plaintiffs cannot establish a substantive due process right to refuse vaccination under the Fourteenth Amendment because vaccination mandates have previously been upheld in the face of what Defendants characterize as similar challenges. ECF 74-1, at 10, 11, 18-19. In so arguing, Defendants avoid confronting the central question raised by Plaintiffs—i.e., whether the available vaccines for COVID-19 are, in fact, "vaccines" as would have been understood by the Court in *Jacobson* and its progeny. Contrary to Defendants' suggestion, Plaintiffs do not ask this Court to reject or reconsider those decisions that have previously upheld mandatory vaccination for schoolchildren, healthcare personnel, or, as in the case of *Jacobson*, citizens of the state of Massachusetts under risk of monetary penalty. Rather, Plaintiffs' well-pled factual allegations point to a critical distinction between mandatory vaccination and forced medical treatment that, held against the well-established right to refuse such treatment, provides no commensurate public health benefit. *See*, *e.g*., ECF 65, at ¶¶ 7(iii)-(vi), (xii), (xiv), 48-59, 81-82, 85-88.

This right to refuse unwanted medical treatment is *fundamental*, as it has deep roots in the United States' history and tradition and is implicit in the concept of ordered liberty. *See*, *e.g.*, *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 269-70 (1990) (analyzing the history of the common law tort of battery in regards to refusing unwanted medical

treatment); *Washington v. Harper*, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."); *Washington v. Glucksberg*, 521 U.S. 702, 724-25 (1997) (reviewing the state of the fundamental right to refuse unwanted medical treatment and reiterating that this right "may be inferred from [the Supreme Court's] prior decisions."). The Ninth Circuit, echoing the Supreme Court, has been unequivocal: "The due process clause of the Fourteenth Amendment substantively protects a person's rights to be free from unjustified intrusions to the body, to refuse unwanted medical treatment and to receive sufficient information to exercise these rights intelligently." *Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002) (internal citations omitted).

But how should the Court draw the distinction between what constitutes a "vaccine," under *Jacobson* and its progeny, and what constitutes a treatment under *Cruzan, et al*? The answer must not be based on mere wordplay or bland appeals to authority, but on the facts.

In *Jacobson*, the Court noted a "common belief" that the smallpox vaccine "ha[d] a *decided tendency to prevent the spread of this fearful disease* and to render it less dangerous to those who contract it." 197 U.S. at 34 (emphasis supplied). The Court emphasized that "[v]accination, *as a means of protecting a community against smallpox*, finds strong support in the experience of this and other countries[.]" *Id*. at 35 (emphasis added). The Court further reasoned that, had the lower court permitted the defendant in *Jacobson* to bring medical experts to testify against the vaccine, the trial judge would have justifiably considered "that for nearly a century most of the members of the medical profession have regarded vaccination, repeated after intervals, as a *preventive*[5] *of smallpox*." *Id*. at 23-24

---

[5] *See* Boylston AW (2012). *The origins of vaccination: no inoculation, no vaccination*, The James Lind Library Bulletin: Commentaries on the history of treatment evaluation, attached as Exhibit "7", available at https://www.jameslindlibrary.org/articles/the-origins-of-vaccination-no-inoculation-no-vaccination/ (explaining that smallpox "vaccination"—back in the late 19th Century—was a procedure that consisted of infecting persons with the cowpox virus which was found to cause less-severe disease and, after successful recovery from the cowpox infection, *produced sterilizing immunity* to smallpox infection upon subsequent exposure *and*, *thus*,

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

(emphasis added) (quoting *Commonwealth. v. Jacobson*, 183 Mass. 242, 243, 66 N.E. 719, 719 (1903)). Finally, the Supreme Court noted that "*the principle of vaccination as a means to prevent the spread of smallpox* ha[d] been enforced in many States[.]" *Id.* at 31-32 (emphasis added).

Defendants' summation of post-*Jacobson* case law underscores this very point: Quoting an opinion of California's Third Appellate District, Defendants write that "compulsory immunization has long been recognized as the gold standard *for preventing the spread of contagious diseases*" and "federal and state courts . . . have held 'either explicitly or implicitly' that '*society has a compelling interest in fighting the spread of contagious diseases through mandatory vaccination* of school-aged children[.]" ECF 74-1 at 11 (emphasis added) (quoting *Love v. State Dept. of Educ.*, 29 Cal. App. 5th 980, 994 (2018) (citation omitted) (emphasis added)). In other words, to the *Jacobson* Court and its progeny, the salient public health benefit of "vaccination" was commonly understood to be the *prevention* of infection and transmission.

Similarly, the stated rationale of LAUSD's Mandate is to support the District's "efforts to provide the safest possible environment in which to learn and work[.]" *See* SAC, ECF 65, at Ex. "A". Defendants confirm that the Mandate was intended to serve the District's interest in "*fighting the spread* of COVID-19 [] through the mandatory

---

*also prevented disease spread*, ultimately leading to smallpox's eradication) (emphasis added); *see also* James Moore, *The History and Practice of Vaccination*, (1817), S. Gosnell, Little Queen Street, London, attached as Exhibit "8", at pp. 1, 8, available at https://ia802706.us.archive.org/29/items/b2135473x/b2135473x.pdf ("The discovery of *a mode of preventing the Small Pox* is one of those splendid events which reflect lustre on the English nation…" and such mode of "*preventing the Small Pox* appertained only to one of those diseases which were vulgarly denominated the Cow Pox ; and that this power principally resided in the liquid secreted during the early stages of that disease…") (emphasis added); *Vaccination*, CHAMBER'S JOURNAL OF POPULAR LITERATURE, SCIENCE, AND ART, Fifth Series, No. 38,.—Vol. I. (Sep. 20, 1884), attached as Exhibit "9", at 595, available at https://archive.org/details/b22468602 (citing to report of Louisiana Board of Health President, Dr. Joseph Jones, that noted "Vaccination, when carefully performed on Jenner's method, is as *complete a protection from smallpox* now as it was in the early part of the century.") (emphasis added).

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

vaccination of its employees." ECF 74-1 at 27 (emphasis added).

Plaintiffs' claims turn on a factual distinction between the assumptions underlying *Jacobson* and the *present circumstances* of the COVID "vaccines"[6] by making substantial, non-conclusory factual allegations demonstrating that the available COVID "vaccines" are in fact medical treatments, chiefly because they are designed to reduce symptoms in the infected vaccine recipient rather than prevent transmission and infection. *See*, *e.g.*, ECF 65, at ¶¶ 7(iii)-(vi), (xii), (xiv), 48-59, 81-82, 85-88. Plaintiffs will present strong evidence of this contention at trial, including by way of testimony from three prominent experts in the fields of epidemiology, pharmacology, and public health.

Plaintiffs' allegations already find ample support in the public record, including in documents reflecting what CDC, NIH, FDA, and the vaccine manufacturers themselves have said about the vaccines' efficacy at preventing infection/transmission. To begin, FDA's Emergency Use Authorization ("EUA") briefing documents[7] demonstrate that the "vaccines" were not designed to prevent contraction or transmission of SARS-CoV-2, but rather only to *lessen the severity of symptomatic COVID-19 cases*, the very essence of treatment. Specifically, during the phase three controlled trials conducted in support of their requests for EUA, the manufacturers reportedly tested everyone in the study population—i.e., everyone in the placebo group and the final "vaccine" group—to evaluate how many "confirmed COVID-19 cases" were identified in each group.[8] The

---

[6] As well, smallpox was much deadlier compared to even the most severe COVID-19 variants/subvariants. Even more is that, today, most of the population—including children and working-age adults—fortunately have near-zero risk of severe disease/death from infection with the currently dominant Omicron variant/subvariants. Such a change in circumstances of disease severity was never seen with the smallpox virus. *See Jacobson*, 197 U.S. at 34 ("Smallpox is known of all to be a dangerous and contagious disease". . . and "vaccination *strongly tends to prevent the transmission or spread* of this disease) (emphasis added) (citation omitted).

[7] The Court may take judicial notice of FDA's documents in ruling on LAUSD's Motion because they are matters of public record. *See*, *e.g.*, *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (citation omitted).

[8] *See, e.g.*, FDA Briefing Document, *Pfizer-BioNTech COVID-19 Vaccine*, Vaccines and Related Biological Products ("VRBP") Advisory Comm. Meeting (Dec. 10, 2020), at

manufacturers' clinical definition of a "confirmed COVID-19 case," for purposes of determining vaccine efficacy, shows that the COVID-19 vaccines were not designed to prevent infection or transmission of the SARS-CoV-2 virus.

To illustrate, the Pfizer EUA Submission states that "the case definition for a confirmed COVID-19 case was the presence of [] symptoms *and* a positive SARS-CoV-2 [nucleic acid amplification-based test][.]"[9] In other words, "a confirmed COVID-19 case" was defined as someone who: (1) tested positive for Covid-19; *and* (2) also had active respiratory symptoms. This means that if someone in the study population tested positive for COVID-19 *but did not have symptoms*, they were not considered a "confirmed COVID-19 case" for purposes of determining the vaccines' "primary efficacy endpoint." In other words, the key metric for evaluating efficacy was not the prevention of infection, but the prevention of symptomatic disease.[10]

If the vaccines were designed to prevent infection, for example, then a "confirmed COVID-19 case" for purposes of determining the primary efficacy endpoint would have included all individuals who tested positive (i.e., all individuals who reportedly became infected with the virus), regardless of whether they were symptomatic. But because the manufacturers were not testing for efficacy against infection and transmission, any such data were limited, at best.[11]

Dr. Deborah Birx—White House Coronavirus Response Coordinator from 2020 to

---

24 ("Pfizer EUA Submission"), attached as Exhibit "10"; *see also* FDA Briefing Document, *Moderna COVID-19 Vaccine*, VRBP Advisory Comm. Meeting (Dec. 17, 2020), at 22-23 ("Moderna EUA Submission"), attached as Exhibit "11"; FDA Briefing Document, *Janssen Ad26.COV2.S Vaccine for the Prevention of COVID-19*, VRBP Advisory Comm. Meeting (Feb. 26, 2021), at 25 ("Janssen EUA submission"), attached as Exhibit "12".

[9] *See* Exhibit "10", Pfizer EUA Submission, at 14.

[10] Moderna and Janssen used the exact same methodology. *See* Exhibit 11, Moderna EUA Submission, at 13; *see also* Exhibit 12, Janssen EUA Submission, at 15.

[11] *See, e.g.*, Exhibit 10, Pfizer EUA Submission, at 48 ("Data are limited to assess the effect of the vaccine *against transmission* of SARS-CoV-2 *from individuals* who are *infected despite vaccination*.") (emphasis added); Exhibit 11, Moderna EUA Submission, at 49 (same); Exhibit 12, Janssen EUA Submission, at 57 (same).

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

2021—acknowledged this fact in her recent testimony before the U.S. Select Subcommittee on the Coronavirus Crisis:[12]

> **REP. JIM JORDAN**: Here's where I'm concerned [] when the government told us [] that people who had been vaccinated couldn't get [the virus] were they guessing or were they lying?
>
> **DR. BIRX**: I don't know. All I know is there was evidence from the global pandemic that natural reinfection was occurring, *and since the vaccine was based on natural immunity you cannot make the conclusion that the vaccine will do better than natural infection*.[13]
>
> **REP JIM JORDAN**: When the government told us that the vaccinated couldn't transmit [the virus] was that a lie or was that a guess?
>
> **DR. BIRX**: *I think it was hope* that the vaccine would work in that way[.][14] . . . [B]ut you should know in those original phase three trials that were done in this country that *we only measured for symptomatic disease*, *so we weren't proactively testing everybody in those trials to see if they got infected*[.][15]

The vaccines' inability to prevent infection and transmission has become increasingly impossible to ignore. By way of two prominent examples, the fully vaccinated and double-boosted President of the United States again contracted COVID just last month,[16] as did the fully vaccinated and double-boosted CEO of Pfizer, Albert Bourla, just

---

[12] *See House Hearing on Trump Administration's COVID-19 Response*, C-SPAN, JUNE 23, 2022, available at https://www.c-span.org/video/?521256-1/house-hearing-trump-administrations-covid-19-response.

[13] *Id*. at 44:00-44:30 (emphasis added).

[14] *Id*. at 45:12-45:23 (emphasis added).

[15] *Id*. at 45:32-46:09 (emphasis added).

[16] *See Press Briefing by Press Secretary Karine Jean-Pierre and COVID-19 Response Coordinator Dr. Ashish Jha*, The White House (July 21, 2022), attached as Exhibit "13",

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

a couple weeks ago.[17] After experiencing his own breakthrough COVID infection, despite being vaccinated and double boosted, Dr. Anthony Fauci acknowledged that "[o]ne of the things that's clear from the data [is] that [*the*] *vaccines*—because of the high degree of transmissibility of this virus—*don't protect overly well*, as it were, *against infection*[.]"[18]

If the vaccines in fact had "a decided tendency to prevent the spread of" COVID, *Jacobson*, 197 U.S. at 34, then these high-profile "break-through" infections in the fully vaccinated and double-boosted should not be happening. A member of CDC's Advisory Committee on Immunization Practices, Dr. Sarah Long, summed up the dilemma in comments to the press:

> With the vaccines currently available, *we should not chase the*
> *rainbows of hoping that those vaccines could prevent infection,*
> *transmission* and even mild disease *because we've learned that*
> *is just not possible*[.] *We just need to give that up with these*
> *vaccines* and focus on preventing severe disease and preventing
> death.[19]

CDC tacitly acknowledged this problem a year ago when it quietly changed its definitions of "vaccine" and "vaccination." *See* SAC, ECF 65, ¶¶7(vii)-(xii), 48-49. Before the change, CDC defined a "Vaccine" as "[a] product that stimulates a person's immune system to *produce immunity* to a specific disease, protecting the person from that

---

(reporting that the "President is fully vaccinated and twice-boosted, so [it's] anticipate[d] that he will respond favorably).

[17] *See Statement from Pfizer Chairman and CEO Albert Bourla on Testing Positive for COVID-19*, Pfizer (Aug. 15, 2022), attached as Exhibit "14".

[18] *See Fauci admits that COVID-19 vaccines do not protect 'overly well' against infection*, FOX News, July 12, 2022, attached as Exhibit "15", available at https://www.msn.com/en-us/health/medical/fauci-admits-that-covid-19-vaccines-do-not-protect-overly-well-against-infection/ar-AAZvCn8 (emphasis added).

[19] *See* Kimball, Spencer, *CDC panel skeptical of fourth Covid shots for broader population, says U.S. needs clear vaccine strategy*, CNBC (Apr. 21, 2022), attached as Exhibit "16", available at https://www.cnbc.com/2022/04/21/cdc-panel-skeptical-of-fourth-covid-shots-for-broader-population-says-us-needs-clear-vaccine-strategy.html (emphasis added).

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

disease."[20] CDC likewise defined "Vaccination" as "[t]he act of introducing a vaccine into the body *to produce immunity* to a specific disease."[21] Both definitions fit the common understanding of those terms. To be *vaccinated* meant that you should have *immunity* to the pathogen targeted by the *vaccine*. Such was the *Jacobson* Court's understanding *vis a vis* smallpox in 1905. 197 U.S. at 34-35.

But in September 2021, CDC quietly rewrote these definitions, changing the definition of a "Vaccine" to "[a] preparation that is used to stimulate the body's immune response against diseases,"[22] and changing the definition of "Vaccination" to "[t]he act of introducing a vaccine into the body to produce protection from a specific disease."[23] By striking the word "immunity" from its definitions of "Vaccine" and "Vaccination," CDC essentially conceded that the COVID-19 vaccines lacked efficacy to produce sterilizing immunity to SARS-CoV-2.

CDC's reasons for changing these definitions was recently revealed in a set of internal emails released pursuant to a FOIA request.[24] In one particular email, CDC employee Alycia E. Downs wrote, "The definition of vaccine we have posted is problematic and people are using it to claim the COVID-19 vaccine is not a vaccine based on our own definition."[25] But the change only prompted further questions from the press and public.[26] Agency employees then coordinated messaging with a media "fact-checker," endorsing the author's view that "it's probably better to use 'protection' than 'immunity'—

---

[20] *Immunization: The Basics* (archived version), CDC, attached as Exhibit 17, available at, https://web.archive.org/web/20210826113846/https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm (last visited Aug. 22, 2022). (emphasis added).

[21] *Id*.

[22] *Immunization: The Basics,* attached as Exhibit 18, CDC, *https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm* (last visited Aug. 22, 2022).

[23] *Id*.

[24] *See CDC Emails On Changing Definitions*, (release July 2022), attached as Exhibit "19".

[25] *Id.* at 27.

[26] *Id*. at 19, 22.

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

given that people don't seem to understand what 'immunity' actually means."[27]

In other words, the word "immunity" had become problematic because, in CDC's view, the public was too stupid to understand what it really meant. So, CDC decided to do away with it, notwithstanding the fact that a layman's understanding of the term had guided constitutional law on public health for over a century. In its haste to redefine language to fit a preferred narrative, CDC failed to recognize that if we cannot have a mutual understanding of the meaning of "vaccine," "vaccination," or "immunity," then the very premise of *Jacobson* and its progeny—the promotion of "the common good," 197 U.S. at 26-27—is necessarily undermined. *For how can we agree on what promotes the common good if we cannot even agree on the meaning of words—especially as those words pertain to a wholly new, and not yet fully understood, application of scientific knowledge to the human body?*

### 2. The Mandate Substantially Burdens and Interferes with Plaintiffs' Fundamental Substantive Due Process Right to Refuse Medical Treatment.

In *Glucksberg*, the U.S. Supreme Court explained that, when an alleged fundamental right is at issue, the "established method of [a] substantive-due-process analysis" consists of a two-step process—first, the court must analyze whether the asserted liberty interest falls within the "fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,'… and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" 521 U.S. at 720-21 (citations omitted). Second, the court must evaluate whether the plaintiff has put forth "'a careful description' of the asserted fundamental liberty interest." *Id*. (citations omitted). Here, Plaintiffs have satisfied the two-step *Glucksberg* framework.

As noted above, the Supreme Court has acknowledged a deeply rooted liberty interest in refusing unwanted medical treatment on multiple occasions. *See Cruzan*, 497 U.S. at 269-70 ("[The] notion of bodily integrity has been embodied in the requirement

---

[27] *Id*. at 40.

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

that informed consent is generally required for medical treatment[,]" and "[t]he logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, *to refuse treatment*.") (emphasis added) (citations omitted); *see also Parham v. J. R.*, 442 U.S. 584 (1979); *Vitek v. Jones*, 445 U.S. 480, 494 (1980); *Harper*, 494 U.S. at 223 (acknowledging, in dicta, that the right to refuse treatment outside of the prison context would be a "fundamental right" subject to strict scrutiny); *Glucksberg*, 521 U.S. at 719-21 (identifying the right to refuse unwanted lifesaving medical treatment as one in a long list of traditional fundamental human rights and liberty interests). Many others outside of government have similarly recognized that the right to refuse medical treatment is fundamental and deeply rooted in our country's history and tradition.[28] Accordingly, Plaintiffs have satisfied step one of *Glucksberg*. As to *Glucksberg* step two, Plaintiffs have "put forth a careful description of the asserted fundamental liberty interest"—i.e., the right to refuse medical treatment—in their pleadings. *See* SAC, ECF 65, ¶¶ 7(vi), (xii), 48-59, 80-88.

### 3. The Mandate Does Not Serve the District's Claimed Interest and, Even If It Did, It Is Not Narrowly Tailored.

Because the Mandate substantially interferes with Plaintiffs' fundamental right to refuse medical treatment—i.e., by forcing them to choose between relinquishing the same or losing the fulfillment of their employment—its validity must be viewed through a lens of strict scrutiny. *See Glucksberg*, 521 U.S. at 721 ("the Fourteenth Amendment forbids the government to infringe [upon] 'fundamental' liberty interests at all, no matter what

---

[28] *See, e.g.*, George J. Annas, JD, et al. (1983), *The Right to Refuse Treatment: A Model Act*, Am. J. Public Health, Vol. 73, No. 8 (1983), doi:10.2105/ajph.73.8.918, PMID:6869647, attached as Exhibit "20" ("the right to refuse medical treatment is universally recognized as a fundamental principle of liberty…") (emphasis added); *see also* Malloy, S. Elizabeth, *Beyond Misguided Paternalism: Resuscitating the Right to Refuse Medical Treatment* (1998), Univ. Cin. Coll. of Law, Faculty Arts. and Other Pubs., Paper 41, attached as Exhibit "21" ("[p]atients' rights to self-determination and autonomy in medical decision-making *have deep historic roots* and command broad respect as abstract principles.") (emphasis added).

process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."); *see also* ECF 65, at ¶¶ 7(vi), (xii), 35, 48-59, 72-74, 82-85, 95, 102-105, 120. The Mandate cannot pass muster under strict scrutiny and, therefore, must be invalidated.

As Plaintiffs allege in the SAC, the COVID "vaccines" do not prevent or reduce the spread of COVID-19—a fact that is now well-documented.[29] Also well-documented is the fact that, in part because the SARS-CoV-2 virus replicates in the sinuses, the vaccinated are just as capable of transmitting the virus as the unvaccinated. *See*, *e.g.*, ECF 65, at ¶¶ 7(iv)-(vi), (xi-xii), (xiv), 49-59, 88.[30] It is therefore axiomatic that the Mandate cannot serve LAUSD's claimed interest of "*fighting the spread of COVID-19* and *protecting its students and staff* through the mandatory vaccination of its employees." ECF 74-1 at 18 (emphasis added).

Indeed, recent studies have shown that, in terms of the currently dominant Omicron variant/subvariants, the vaccines confer *negative* efficacy—meaning they *increase* your risk of contracting the Omicron variant.[31] This means that the Mandate may actually subject LAUSD's staff to an *increased* risk of becoming infected with and, therefore,

---

[29] *See, e.g.,* Franco-Paredes, Carlos (2022), *Transmissibility of SARS-CoV-2 among fully vaccinated individuals*, Corresp., The Lancet J. Inf. Dis., Vol. 22, Iss. 1 (Jan. 2022) at 16, https://doi.org/10.1016/S1473-3099(21)00768-4, attached as Exhibit "22" (opining that "…the demonstration of COVID-19 breakthrough infections among fully vaccinated health-care workers (HCW) in Israel, who in turn may transmit this infection to their patients, requires a reassessment of compulsory vaccination policies leading to the job dismissal of unvaccinated HCW in the USA.").

[30] *See also* Riemersma, K. K., et al., *Shedding of infectious SARS-CoV-2 despite vaccination*. medRxiv, (July 5, 2022), doi: https://doi.org/10.1101/2021.07.31.21261387, attached as Exhibit "23".

[31] *See* Buchan, Sarah, et al. (2022, preprint), *Effectiveness of COVID-19 vaccines against Omicron or Delta infection*, medRxiv, doi: https://doi.org/10.1101/2021.12.30.21268565, attached as Exhibit "24" ("We also observed negative [efficacy] against Omicron among those who had received 2 doses compared to unvaccinated individuals."); *see also Weekly status report of the RKI on coronavirus disease-2019 (COVID-19)*, Robert Koch Institut, Dec. 30, 2021, at p.14 of English translation, attached as Exhibit "25", available at file:///C:/Users/18165/Downloads/Wochenbericht_2021-12-30%20(1).pdf (finding 78.6 percent (4,020 of 5,117) of sequenced Omicron cases were in vaccinated Germans).

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

transmitting the virus. Thus, as pled in the SAC, the Mandate clearly does not serve the District's claimed interest. *See*, *e.g.*, ECF 65, at ¶¶ 85-88.

Even assuming arguendo that the COVID vaccines do prevent the spread of COVID-19, or that LAUSD has a compelling interest in reducing COVID symptoms in its employees, the Mandate is not narrowly tailored because it fails to recognize that natural immunity from prior infection, such as that enjoyed by many of the Plaintiffs in this matter,[32] is *at least* equal to if not superior to whatever "protection" is afforded by the "vaccines." *See*, *e.g.*, SAC, ECF 65, at ¶¶ 7(i)-(ii), 46-47, 89-92. This is irrefutable.

In January of this year, CDC published a study in its weekly Morbidity and Mortality Report in which researchers tracked COVID hospitalizations among adults in New York and California by vaccination status and prior infection.[33] The results of this study proved "that surviving a previous infection protects against a reinfection and related hospitalization. Importantly, *infection-derived protection was higher after the Delta variant became predominant,* a time when vaccine-induced immunity for many persons declined because of immune evasion and immunologic waning."[34] Stated differently, CDC's own data has demonstrated that natural immunity is superior to the "vaccines," particularly in terms of preventing subsequent infection and hospitalization compared to vaccinated persons who are immunologically naïve,[35] and this superiority specifically

---

[32] *See*, *e.g.*, SAC, ECF 65, at ¶¶ 9, 75, 77.

[33] León TM, Dorabawila V, Nelson L, et al. (2022), *COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis — California and New York, May–November 2021*, MMWR Morb. Mortal Wkly. Rep. 2022;71:125–131, DOI: http://dx.doi.org/10.15585/mmwr.mm7104e1, attached as Exhibit "26".

[34] *Id*. (emphasis added).

[35] *See id*. ("As the Delta variant prevalence increased to >95%[,] rates increased more rapidly among the vaccinated group with no previous COVID-19 diagnosis than among [] the. . . unvaccinated group[] with a previous COVID-19 diagnosis.") (citing Supplementary Figure 1, attached as Exhibit "27", available at https://stacks.cdc.gov/view/cdc/113253; Supplementary Figure 2, attached as Exhibit "28", available at https://stacks.cdc.gov/view/cdc/113253).

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

increased as the Delta variant became predominant.[36]

Furthermore, the Mandate wholly fails to consider the existence of currently available alternative treatments for SARS-CoV-2, such as Pfizer's authorized antiviral medication, Paxlovid. In addition, there are multiple drug combinations that have shown massive benefits at safely and effectively treating and preventing COVID-19, which Plaintiffs will demonstrate through competent expert testimony. These include but are not limited to a combination of hydroxychloroquine ("HCQ"), ivermectin ("IVM"), corticosteroids, high-dose vitamins, zinc, and anticoagulation and oxygen saturation drugs. Notably, to date, there have been at least 329 peer reviewed studies on the safety and efficacy of HCQ to treat/prevent COVID-19, and 124 peer reviewed studies on IVM, the results from which indisputably demonstrate a higher safety and efficacy profile compared to the COVID "vaccines."[37]

Even more, and despite encompassing over 70,000 LAUSD employees/staff members, the Mandate utterly disregards the substantial safety concerns associated with the vaccines. *See*, *e.g*., SAC, ECF 65, at ¶¶ 7(xiii)-(xiv), 63-70. The Mandate also fails to consider the lack of long-term safety data despite these already-known and potentially life-threatening short-term side effects.  Even if the known and unknown risks were acceptable for the immunologically naïve, which they are not, requiring a naturally immune person to accept that risk, *with none of the benefit*, attacks liberty at its core.

For these reasons, the Mandate must be invalidated because it does not serve the District's claimed interest, let alone in a narrowly tailored fashion. *See, e.g., Lopez-*

---

[36] *See id.* at "FIGURE," attached as Exhibit "29".

[37] *See COVID-19 treatment studies for Hydroxychloroquine*, https://c19hcq.com/ (last accessed on August 15, 2022); *see also COVID-19 treatment studies for Ivermectin*, https://c19ivermectin.com/ (last accessed on August 15, 2022). Notably, the drug Chloroquine (from which HCQ is derived) was recognized as a viable treatment option for SARS-CoV as early as 2004. *See* Keyaerts, Els, et al. (2004), *In vitro inhibition of* [*SARS-CoV*] *by chloroquine*, J. Biochemical & Biophysical Rsch. Comm., attached as Exhibit "30", available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7092815/pdf/main.pdf.

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

1   *Valenzuela v. Arpaio*, 770 F.3d 772, 791 (9th Cir. 2014) (holding state law failed strict
2   scrutiny where it "*represent*[*ed*] *a '*scattershot attempt*'* at addressing [the state's claimed
3   interest] and [therefore was] not narrowly tailored…") (emphasis added) (citations
4   omitted). At the very minimum, the Court should find that Plaintiffs have sufficiently stated
5   a substantive due process claim for which relief may and should be granted under the
6   Fourteenth Amendment. *See Glucksberg*, 521 U.S. at 721. Defendants' Motion should
7   therefore be denied.

8          C.    **Plaintiffs Sufficiently State a Claim For Violation of Equal Protection**
9                **Under the Fourteenth Amendment.**

10         Plaintiffs agree that "[t]he Equal Protection Clause [] keeps governmental decisions
11  makers from treating differently persons who are in all relevant aspects alike." *See* ECF
12  74-1, at 14 (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). And, similar to above, an
13  "equal protection analysis requires strict scrutiny of a [governmental] classification [] when
14  the classification impermissibly interferes with the exercise of a fundamental right[.]" *U.S.*
15  *v. Lee*, 957 F.2d 778, 782 (10th Cir. 1992), *cert. denied*, 506 U.S. 978 (1992); *see also*
16  *Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003) (citations omitted); *Glucksberg*,
17  521 U.S. at 721.

18         Thus, strict scrutiny applies to Plaintiffs' equal protection claim because, as
19  demonstrated above and throughout, the Mandate irrefutably (and substantially) interferes
20  with Plaintiffs' fundamental right to refuse medical treatment by classifying LAUSD
21  employees based on "vaccination" status. *See*, *e.g.*, ECF 65, at ¶¶ 7(vi), (xii), 35, 48-59,
22  72-74, 82-85, 95, 102-105, 120. As such, the Mandate must be invalidated because
23  Defendants cannot demonstrate that treating "unvaccinated" persons differently from
24  "vaccinated" persons "substantially furthers an important government interest," *Green*,
25  340 F.3d at 896, where both classes of people are at the same risk of contracting and
26  transmitting the virus, and where people with a prior COVID-19 infection, such as many
27  of the Plaintiffs in this case, enjoy at least equal if not *superior* protection against COVID-
28  19 compared to vaccinated persons with no prior infection. Stated differently, the Mandate

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

must be invalidated as unconstitutional because there is no "important government interest" that is "substantially further[ed]" by LAUSD "treating differently ['vaccinated' and 'unvaccinated' employees] *who are in all relevant respects alike*…" *See* ECF 74-1, at 14 (emphasis added); *see also Green*, 340 F.3d at 896.

Indeed, CDC recently upended any justification for differential treatment based on "vaccination" status in its updated COVID-19 guidelines:

> ***CDC's COVID-19 prevention recommendations no longer differentiate based on a person's vaccination status*** *because breakthrough infections occur, though they are generally mild, and persons who have had COVID-19 but are not vaccinated have some degree of protection against severe illness from their previous infection.[38]*

In other words, CDC acknowledges that differential treatment of the unvaccinated cannot be justified.

Defendants side-step the allegations in Plaintiffs' SAC and, instead, simply argue that the "Mandate [] is applicable to all District employees, and [] does not implicate fundamental rights[.] Thus, rational basis review applies here." *See* ECF 74-1, at 15. But Defendants' authorities are distinguishable. For example, *Whitlow v. California*, 203 F. Supp. 3d 1079 (S.D. Cal. 2016) involved personal belief exemptions for childhood school vaccine requirements, and *Brown v. Smith*, 24 Cal. App. 5th 1135 (2018) challenged the constitutionality of a California statute requiring school exclusion of any student "who had not been vaccinated against small-pox" and "eliminated the previously existing 'personal beliefs' exemption from mandatory immunization requirements for school children," *see id.* at 1138. The case here is very different, in that Plaintiffs challenge the differential treatment of individuals based on their purported "vaccination" status despite all LAUSD

---

[38] *See* Greta M. Massetti, PhD, et al., *Summary of Guidance for Minimizing the Impact of COVID-19 on Individual Persons, Communities, and Health Care Systems — United States*, August 2022 (early release), MMWR Morb Mortal Wkly Rep. ePub: 11 August 2022. DOI: http://dx.doi.org/10.15585/mmwr.mm7133e1, attached as Exhibit "31".

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

employees having the same risk of contracting and transmitting the virus.

Indeed, given the by-now widely acknowledged benefit of natural immunity, including CDC's acknowledgment in its recently-updated COVID-19 guidelines,[39] the Mandate should not even survive rational basis review under the Equal Protection Clause. *See*, *e.g.*, *Fowler Packing Co.*, *Inc. v. Lanier*, 844 F.3d 809, 816 (9th Cir. 2016).

At the very minimum, the Court should find that Plaintiffs have brought a viable equal protection claim against Defendants for which prospective relief may and should be granted under the Fourteenth Amendment to the United States Constitution. Defendants' Motion should accordingly be denied.

## CONCLUSION

Based on the above and foregoing, Plaintiffs respectfully request this Court deny Defendants' Motion For Judgment On The Pleadings as to Plaintiffs' First and Second Causes of Action (violation of substantive due process and equal protection). Plaintiffs have previously agreed to dismissal, without prejudice, of their Third (violation of privacy under California state constitution), Fourth (disparate treatment and failure-to-accommodate under ADA), Fifth (violation of due process under *Skelly*), Sixth (public disclosure of private facts), and Seventh (breach of security for computerized personal information) Causes of Action.

Dated: August 22, 2022

**ADVOCATES FOR FAITH & FREEDOM**

*/s/ Robert H. Tyler*
Robert H. Tyler

Dated: August 22, 2022

**HADAWAY, PLLC**

---

[39] *See supra*, Massetti, *et al.*, n.38.

/s/ Brant Hadaway
Brant Hadaway

**DAVILLIER LAW GROUP**

/s/ George Wentz
George Wentz

*Attorneys for Plaintiffs*
*Health Freedom Defense Fund, Inc., California*
*Educators For Medical Freedom, Miguel Sotelo,*
*Jeffrey Fuentes, Sandra Garcia, Hovhannes*
*Saponghian, and Norma Brambila*

Dated: August 22, 2022

PLAINTIFFS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS