EXHIBIT 1



Robert H. Tyler, Esq., CA Bar No. 179572
btyler@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone:  (951) 600-2733
Facsimile:   (951) 600-4996

Brant C. Hadaway (*Pro Hac Vice*)
bhadaway@davillierlawgroup.com
HADAWAY, PLLC
2425 Lincoln Ave.
Miami, Florida 33133
Telephone:  (305) 389-0336

George R. Wentz, Jr. (*Pro Hac Vice*)
gwentz@davillierlawgroup.com
DAVILLIER LAW GROUP, LLC
935 Gravier Street, Ste. 1702
New Orleans, LA 70112
Telephone:  (504) 458-7143

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

HEALTH FREEDOM DEFENSE FUND, INC., a Wyoming Not-for-Profit Corporation; CALIFORNIA EDUCATORS FOR MEDICAL FREEDOM, an unincorporated association ~~MIGUEL SOTELO~~; JEFFREY FUENTES; SANDRA GARCIA; ~~and~~ HOVHANNES SAPONGHIAN; and NORMA BRAMBILA;

      Plaintiffs,

      v.

ALBERTO CARVALHO, in his

Case No.: 2:21-cv-08688-SB-MAA

Hon. Stanley Blumenfeld, Jr.

Courtroom 6C

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND DECLARATORY AND INJUNCTIVE RELIEF

**DEMAND FOR JURY TRIAL**

Formatted: No underline

1

JW HOWARD/ ATTORNEYS LTD
701 B Street, Suite 1725
San Diego, California 92101

official capacity as Superintendent of the Los Angeles Unified School District; ILEANA DAVALOS, in her official capacity as Chief Human Resources Officer for the Los Angeles Unified School District; KRISTEN MURPHY, in her official capacity as Chief of Employee Support and Labor Relations for the Los Angeles Unified School District; GIFTY J. BEETS, in her official capacity as Assistant Chief Human Resources Officer for the Los Angeles Unified School District; SMITA MALHOTRA, in her official capacity as Medical Director for the Los Angeles Unified School District; GEORGE MCKENNA, MÓNICA GARCÍA, SCOTT SCHMERELSON, NICK MELVOIN, JACKIE GOLDBERG, KELLY GONEZ, and TANYA ORTIZ FRANKLIN, in their official capacities as members of the Los Angeles Unified School District governing board.

Defendants.

Plaintiffs, for their Complaint against Defendants, allege as follows:

**INTRODUCTION**

1. On March 4, 2021, Defendants' predecessors issued a policy requiring that employees of the Los Angeles Unified School District ("LAUSD") be vaccinated against COVID-19. *See California Educators for Medical Freedom, et al v. Austin Beutner, et al*, Case No. 21-cv-2388 (the "Original Lawsuit"). In response, the Original Lawsuit was filed on March 17, 2021. *Id.* at Ecf. No. 1.

2. On March 18, 2021, in a frankly cynical effort to create a ripeness issue, LAUSD reversed its policy and gave employees the option of regular testing. Ecf. No. 25 at ¶¶76-86. As a result, Defendants' predecessors argued that Plaintiffs' allegations relied on a future contingency *that might not occur*, and that the lawsuit was therefore not ripe for adjudication. *Id*. at Ecf. 33-1, 41.

3. On July 27, 2021 the Court dismissed the case, without prejudice, based on ripeness. *Id*. at Ecf. No. 44. "That Defendants were contemplating requiring the vaccine," the Court concluded, "and then later reversed course and explicitly said they would not be, does not create a ripe case or controversy."

4. Nevertheless, on August 13, 2021 – *a mere 17 days after winning dismissal based on ripeness* – Defendants enacted a mandatory "COVID-19 VACCINATION REQUIREMENT FOR EMPLOYEES AND OTHER ADULTS WORKING AT DISTRICT FACILITIES." (the "Mandate"). *See* **Exhibit "A",** attached hereto. That, of course, was the plan all along. Employees ~~must~~were to receive the first dose by October 15~~, 2021~~, 2021.[1]

5. Plaintiffs ~~have been~~were notified that if they ~~fail~~failed to comply with the deadline of October 15, 2021, they ~~will~~would be forbidden from returning to work effective October 16 and ~~will~~would be terminated~~ effective November 1, 2021~~.

6. Prior representations to the Court notwithstanding, Defendants were at least honest enough to call their policy a "mandate."

7. Plaintiffs assert that Defendants' Mandate cannot be supported when:

i. Infection from COVID induces robust and durable natural immunity.

ii. The natural immunity so obtained is superior to COVID vaccine-induced immunity. This has now been acknowledged through data

[1] Extended from the original deadline of October 15, 2021.

Formatted: Line spacing: single

published by the Centers for Disease Control and Prevention ("CDC").

iii. The COVID vaccines are ineffective at preventing infection from COVID, including but not limited to the Delta and Omicron strains, the latter of which now constitutes 100% of all infections throughout the United States.

iv. The CDC Director admitted that the COVID vaccines do not prevent infection or transmission of COVID. "[W]hat they [the vaccines] can't do anymore is prevent transmission."[2] That was during the Delta wave. The CDC similarly acknowledges that "[b]reakthrough infections are likely to occur" with Omicron.[3]

v. The CDC acknowledged that the vaccinated and unvaccinated are equally likely to spread the virus.[4]

vi. The vaccines only reduce symptoms of those who are infected by COVID, but not transmission of the virus. They are, therefore, treatments, and not vaccines as that term has always been defined in the law.

---

[2] Madeline Holcomb, *Fully Vaccinated People Who Get a CoVID-19 Breakthrough Infection Transmit the Virus, CDC Chief Says,* CNN Health (August 6, 2021) https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html (last visited February 18, 2022), *see also* The New England Journal of Medicine, *Resurgence of SARS-CoV-2 Infection in a Highly Vaccinated Health System Workforce,* N Engl J Med 2021; 385:1330-1332 (September 30, 2021) https://www.nejm.org/doi/full/10.1056/NEJMc2112981(last visited October 18, 2021).

[3] https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last visited on February 18, 2022).

[4] Brown CM, et al., Outbreak of SARS-CoV-2 Infections, Including COVID 19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings-Barstable County, Massachusetts, July 2021. MMWR Morb Mortal Wkly Rep 2021;70:1059-1062. https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w (last visited October 18, 2021).

Formatted: Line spacing: single

vii. In fact, the CDC has actually changed its definitions of "vaccine" and "vaccination" to fit with the currently-available COVID Vaccines. Until recently, the Centers for Disease Control defined a "Vaccine" as: "A product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease."[5]

viii. The CDC also previously defined "Vaccination" as: "The act of introducing a vaccine into the body to produce immunity to a specific disease."[6]

ix. Both prior definitions fit the common understanding of those terms. To be *vaccinated* meant that you should have lasting, robust immunity to the disease targeted by the *vaccine*.

x. But on September 1, 2021, the CDC quietly rewrote these definitions. It changed the definition of a "Vaccine" to: "A ~~product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease~~ *preparation that is used to stimulate the body's immune response against diseases*."[7] It changed the definition of "Vaccination" to: "The act of introducing a vaccine into the body to produce ~~immunity to~~ *protection from* a specific disease."[8]

---

[5] *Immunization: The Basics* (archived version), Centers for Disease Control and Prevention https://web.archive.org/web/20210826113846/https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm (last visited October 20, 2021).

[6] *Id.*

[7] *Immunization: The Basics*, Centers for Disease Control and Prevention https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm (last visited October 20, 2021).

[8] *Id.*

Formatted: Line spacing: single

xi. In other words, the CDC has eliminated the word "immunity" from its definitions of "Vaccine" and "Vaccination." The CDC did so because it recognizes that the COVID Vaccines do not produce immunity to COVID-19.

xii. This is a critical factual and legal distinction. Legal authority to mandate medical treatment only derives under public health regulations. As the CDC now holds that Omicron is the only strain;, that the shots do not stop the transmission of or infection from Omicron; (and indeed the latest data shows reverse efficacy for the vaccines against Omicron – i.e., that vaccination is merebeing vaccinated or boosted enhances one's likelihood of contracting Omicron), and that the vaccines are intended to provide "protection" against athe development of symptomatic disease and not sterilizing "immunity" against the disease;, there is no public health basis for mandating vaccination.

xiii. The COVID vaccines cause a significantly higher incidence of injuries, adverse reactions, and deaths than any prior vaccines that have been allowed to remain on the market, and, therefore, pose a significant health risk to recipients, who are, by definition, healthy when they receive the COVID vaccines; and

xiv. Since, according to the CDC, the COVID vaccines do not prevent the infection or transmission of COVID, while at the same time, also according to the CDC, they result in a massively anomalous (1000% higher) number of adverse events and deaths, there is no justification in the law for mandating them, and LAUSD's mandate must therefore be struck down.

**PARTIES**

~~8. Plaintiffs reallege all allegations set forth elsewhere in this Complaint as if fully set forth herein.~~

~~9.~~8. Plaintiff Health Freedom Defense Fund (hereinafter, "HFDF") is a not-for-profit public benefit Wyoming corporation with its headquarters in Sandpoint, Idaho. HFDF is a member organization that seeks to advocate for and educate the public on the topics of medical choice, bodily autonomy, and self-determination, and that opposes laws and regulations that force individuals to submit to the administration of medical products, procedures, and devices against their will. Several of HFDF's members are LAUSD employees who are directly affected by the Mandate, and therefore would have standing in their own right to bring this action. *See* Declarations, attached hereto as Composite **Exhibit "B".** These include persons with natural immunity and religious objections to vaccination whose exemptions have been denied. As well, the interests at stake in this case are germane to HFDF's purpose, and neither the claims asserted, nor the relief requested requires the individual participation of its members.

~~10.~~9. Plaintiff California Educators for Medical Freedom ("CAEMF") is a voluntary, unincorporated association of California state education employees whose purpose is to advocate for medical choice and bodily autonomy on behalf of its members, vis a vis the Mandate. Its membership includes numerous employees of LAUSD. *See* Declaration of Nancy Worsham, attached hereto as **Exhibit "C."** CAEMF's members are directly affected by the Mandate, and therefore would have standing in their own right to bring this action. As well, the interests at stake in this case are germane to CAEMF's purpose, and neither the claims asserted nor the relief requested requires the individual participation of its members.

~~11. Plaintiff MIGUEL SOTELO is a citizen of Los Angeles County and is employed by LAUSD as an Electrician.~~

~~12.~~10. Plaintiff JEFFREY FUENTES is a citizen of Los Angeles County and is employed by LAUSD as an Electrician.

~~13.~~11. Plaintiff SANDRA GARCIA is a citizen of Los Angeles County and is employed by LAUSD as a Special Education Assistant.

~~14.~~12. Plaintiff HOVHANNES SAPONGHIAN is a citizen of Los Angeles County and is employed by LAUSD as a Teacher Assistant.

~~15.~~13. Plaintiff NORMA BRAMBILA is a citizen of Los Angeles County and is employed by LAUSD as a Healthcare Assistant.

~~16.~~14. Allegations regarding "Plaintiffs" hereinbelow shall be deemed to include the individual Plaintiffs and the members of Plaintiff HFDF.

~~17.~~15. Defendant ALBERTO CARVALHO is the Superintendent of LAUSD and is *sui juris*. Mr. Carvalho is ultimately charged with, *inter alia*, enforcing all employment policies of the LAUSD. He is being sued in his official capacity.

~~18.~~16. Defendant ILEANA M. DAVALOS is the Chief Human Resources Officer for LAUSD and is *sui juris*. On information and belief, Ms. Davalos is charged with developing and enforcing all employment policies of LAUSD, including the Mandate. She is named as a defendant herein in her official capacity.

17. Defendant KRISTEN MURPHY is the Chief of Employee Support and Labor Relations of the LAUSD. Dr. Murphy was identified by Defendant Ileana Davalos as primarily involved in the formulation and enforcement of the Mandate. She is named as a defendant herein in her official capacity.

18. Defendant GIFTY J. BEETS is the Assistant Chief Human Resources Officer of the LAUSD. Ms. Beets was identified by Defendant Ileana Davalos as primarily involved in the formulation and enforcement of the Mandate. She is named as a defendant herein in her official capacity.

19. Defendant SMITA MALHOTRA is the Medical Director of the LAUSD. Dr. Malhotra was identified by Defendant Ileana Davalos as primarily involved in the formulation and enforcement of the Mandate. She is named as a defendant herein in her official capacity.

~~19.~~20. Defendants GEORGE MCKENNA, MÓNICA GARCÍA, SCOTT SCHMERELSON, NICK MELVOIN, JACKIE GOLDBERG, KELLY GONEZ, and TANYA ORTIZ FRANKLIN are LAUSD's governing board members. They are named as Defendants herein in their official capacities.

~~20. Defendants Reilly and Davalos have personally undertaken actions under color of law that deprive or imminently threaten to deprive Plaintiffs of certain rights, privileges, and immunities under the laws and Constitution of the United States, and under the laws and Constitution of the State of California. Upon information and belief, the other defendants have also personally undertaken actions under color of law that deprive or imminently threaten to deprive Plaintiffs of certain rights, privileges, and immunities under the laws and Constitution of the United States, and under the laws and Constitution of the State of California~~

21. This lawsuit seeks prospective relief against Defendants in their official capacities.

~~22. Defendants, through their acts and omissions complained of herein are liable to Plaintiffs for damages in an amount to be proven at trial including, but limited to, damages for lost income, loss of employment opportunities and deprivation of constitutional and other civil rights. But for Defendants' qualified immunity this suit would include a demand that Plaintiffs be compensated for these damages. Upon information and belief, discovery will reveal grounds for claiming one or more exceptions to the doctrine of qualified immunity. If that occurs, Plaintiffs will seek leave to amend this Complaint to assert claims for money damages against Defendants in their individual capacities.~~

**JURISDICTION AND VENUE**

~~23. Plaintiffs reallege and incorporate the allegations set forth above.~~

~~24.~~22. This Court has jurisdiction to hear this case under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws

and Constitution of the United States, as well as under 28 U.S.C. § 1343(3) in relation to Defendants' intent to deprive Plaintiffs of certain rights, privileges, and immunities as detailed herein.

~~25. This Court has jurisdiction over the claims asserting violations of the laws and Constitution of the State of California through its supplemental jurisdiction under 28 U.S.C. § 1367(a), as those claims are so closely related to the Plaintiffs' federal question and 42 U.S.C. § 1983 claims that they form part of the same case or controversy under Article III of the United States Constitution.~~

~~26.~~23. This Court has the authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(a), Rule 65 of the Federal Rules of Civil Procedure, and its traditional equitable power to enjoin unconstitutional actions by state agencies and officials; and attorneys' fees and costs under 42 U.S.C. § 1988.

~~27.~~24. The Central District of California, Western Division is the appropriate venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the District in which Defendants reside, exercise their authority in their official capacities, and/or have threatened to deprive Plaintiffs of the rights and liberties under the laws and Constitution of the United States, and in addition thereto to violate the laws and Constitution of the State of California, as further alleged herein. It is also the District in which a substantial part of the events giving rise to Plaintiffs' claims have occurred and continue to occur.

**GENERAL ALLEGATIONS**

~~28.~~25. On January 30, 2020, the World Health Organization ("WHO") declared a "public health emergency of international concern over the global outbreak" of COVID-19. Among other recommendations, the WHO called for accelerated development of "vaccines, therapeutics and diagnostics."

~~29.~~26. On January 31, 2020, President Trump first issued a public health state of emergency in the United States under the Public Health Service Act due to COVID.

~~30.~~27. Also on January 31, 2020, Secretary of Health and Human Services Alex M. Azar II, issued a Declaration of a Public Health Emergency effective as of January 27, 2020. This declaration has been renewed thereafter on April 21, 2020, July 23, 2020, October 2, 2020, January 7, 2021, April 15, 2021, and July 19, 2021.

~~31.~~28. President Trump issued a subsequent declaration of emergency under the Stafford Act and National Emergencies Act on March 13, 2020, due to COVID.

~~32.~~29. A third declaration of emergency was issued by President Trump on March 18, 2020, under the Defense Production Act due to COVID.

~~33.~~30. On February 24, 2021, President Biden extended President Trump's March 13, 2020 declaration of emergency, stating as a reason for doing so that more "than 500,000 people in this Nation have perished from the disease."[9]

~~34.~~31. Thus, the United States has been in a constant state of emergency due to COVID (the "COVID Emergency") since January 31, 2020, a period of over twenty months.

~~35.~~32. The COVID Emergency has been used to justify lockdowns, banning of worship services, mandatory masks, vaccine passports, and now mandatory vaccinations such as the vaccination requirement LAUSD has placed on each of its employees upon penalty of termination.

~~36.~~33. Never in this history of this nation have its citizens been subjected to such invasions of their individual rights and liberties.

---

[9] President Joseph R. Biden, Jr., *Notice on the Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic* (February 24, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/24/notice-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic/

Formatted: Line spacing: single

**Mandatory Vaccination Is Not Justified**

**A. The Statistics Underlying Defendants' Justification for the Mandate are Flawed**

**i. COVID Hospitalizations are Highly Inflated**

~~37.~~34. Every patient that is admitted to a hospital is subject to a PCR test due to the perceived COVID Emergency, regardless of whether that patient is admitted for COVID reasons.

~~38.~~35. Testing every patient results in a large number of patients being admitted "with COVID," as opposed to "from COVID." This significantly inflates the number of COVID patients.

~~39.~~36. Moreover, the CARES Act increases reimbursements to hospitals for all patients who have been diagnosed with COVID, creating an economic incentive for hospitals to inflate their COVID admissions numbers.

~~40.~~37. As a result, the COVID hospitalization data being used to shape public policy is highly inflated.

38. Indeed, in a town hall meeting on July 13, 2022 officials for the University of Southern California, ("LAC + USC") Medical Center stated:

> The numbers at LAC COVID-positive tests have continued to go up, but this isn't because we're seeing a ton of people with symptomatic disease getting admitted.... We're seeing a lot of people with mild disease in urgent care/ED who go home and do not get admitted, and of those who are admitted, they are 90% of the time not admitted due to COVID. Only 10% of

our COVID-positive admissions are admitted due to COVID. Virtually none of them go to the ICU.[10]

**ii. The COVID Death Count is Highly Inflated**

~~41.~~39. On March 24, 2020, the CDC issued COVID Alert Number 2.11 This Alert substantially changed how the cause of death was to be recorded exclusively for COVID. The modification ensured that in any case where the deceased had a positive PCR test for COVID, then COVID was listed as the cause of death.[12]

~~42.~~40. Prior to this March 24, 2020, change in procedure, COVID would only have been listed as the cause of death in those cases where COVID was the actual cause of death. If the deceased had a positive PCR test for COVID, but had died of another cause, then COVID would have been listed as a contributing factor to the death, but not the cause.[13]

~~43.~~41. The 2003 CDC Medical Examiner's and Coroner's Handbook on Death Registration and Fetal Death Reporting states that in the presence of pre-existing conditions, infectious disease is recorded as the contributing factor to death, not the cause.[14] This was always the reporting system until the death certificate modification issued by the CDC on March 24, 2020.[15]

---

[10] Dr. Brad Spellberg, Chief Medical Officer, LAC+USC Medical Center, "LAC+USC Virtual Town Hall Meeting – LAC+USC Medical Center, YOUTUBE, https://www.youtube.com/watch?v=_fGuA-nU7EI (last visited July 18, 2022) (at timecode 08:14).

[11] National Vital Statistics System, *COVID-19 Alert No. 2* (March 24, 2020), https://www.cdc.gov/nchs/data/nvss/coronavirus/Alert-2-New-ICD-code-introduced-for-COVID-19-deaths.pdf (last visited October 18, 2021).

[12] *Id.*

[13] *Id.*

[14] Medical Examiners' and Coroners' Handbook on Death Registration and Fetal Death Reporting, 2003 Revision. CDC, 2003, Pgs. 13-16. https://www.cdc.gov/nchs/data/misc/hb_me.pdf (last visited October 18, 2021).

[15] National Vital Statistics System, *COVID-19 Alert No. 2* (March 24, 2020), https://www.cdc.gov/nchs/data/nvss/coronavirus/Alert-2-New-ICD-code-introduced-for-COVID-19-deaths.pdf.

Formatted: Line spacing: single

~~44.~~42. This death certificate modification by the CDC was not made for any other disease; only COVID. Accordingly, a double standard was created for the recordation of deaths, skewing the data for all deaths after March 24, 2020, reducing the number of deaths from all other causes, and dramatically increasing the number of deaths attributed to COVID.

~~45.~~43. As a result, the COVID death data used to shape public health policy is significantly inflated.[16]

**B. COVID Infection Leads to Robust Natural Immunity**

~~46.~~44. Those who recover from infection from COVID enjoy robust and durable natural immunity. Natural immunity is at least equivalent or superior to vaccine-induced protection from COVID-19.

~~47.~~45. The CDC's own data acknowledges that, even accepting the CDC's criteria for COVID hospitalizations during the Delta wave, hospitalizations were lower for unvaccinated persons with a prior COVID diagnosis than they were for vaccinated persons with no prior COVID diagnosis.[17] And that same study showed no appreciable benefit from vaccination for those who had a prior infection. *Id*. Thus, even by the CDC's own data, natural immunity is indisputably superior.

**C. The COVID Injections are Treatments, Not Vaccines.**

~~48.~~46. As the CDC tacitly concedes by changing its own definitions of "Vaccine" and "Vaccination," the COVID vaccines are not vaccines in the traditional sense. In fact, the FDA classifies them as "CBER-Regulated Biologics~~"~~," otherwise known as

---

[16] CDC, *COVID-19 Forecasts: Deaths* (last accessed September 30, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/forecasting-us.html (last visited October 18, 2021)

[17] *See* CDC, Morbidity and Mortality Weekly Report, "COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis — California and New York, May–November 2021," (Jan. 28, 2022), available online at: https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm#contribAff (last viewed on February 18, 2022).

Formatted: Line spacing: single

"therapeutics"," which falls under the "Coronavirus Treatment Acceleration Program."[18]

49.47. The Vaccines are misnamed since they do not prevent either re-infection or transmission of the disease, the key elements of a vaccine. The CDC has publicly stated that the Vaccines are effective in reducing the severity of the disease but not infection, re-infection, or transmission. Indeed, as noted above, the CDC has stricken the very word "immunity" from its definitions of "Vaccine" and "Vaccination." The injection is therefore a treatment, not a vaccine.

50. The current strain of COVID is the Omicron strain.[19] The CDC Director previously stated that the vaccines did not stop transmission of the Delta strain, as studies showed that the Delta strain passed easily amongst vaccinated persons.[20] The CDC recently acknowledged that "anyone with Omicron infection can spread the virus to others, even if they are vaccinated or don't have symptoms."[21] This was also true with the Delta variant.[22]

51.48. One of the reasons that the InjectionsVaccines do not prevent transmission is that coronaviruses like SARS-CoV-2 rapidly mutate. The InjectionsVaccines were designed to address the original strain of the Virus. However, during the course of

[18] FDA, *Coronavirus (COVID-19) | CBER-Regulated Biologics*, https://www.fda.gov/vaccines-blood-biologics/industry-biologics/coronavirus-covid-19-cber-regulated-biologics (last visited October 18, 2021); *See also,* FDA, *Coronavirus Treatment Acceleration Program (CTAP)*, https://www.fda.gov/drugs/coronavirus-covid-19-drugs/coronavirus-treatment-acceleration-program-ctap (last visited October 18, 2021).

[19] CDC, *Variant Proportions* (last visited September 30, 2021), **Error! Hyperlink reference not valid.** (last visited February 18, 2022).

[20] The Lancet, *Transmission of SARS-CoV-2 Delta Variant Among Vaccinated Healthcare Workers, Vietnam* (August 10, 2021), **Error! Hyperlink reference not valid.** (last visited October 18, 2021).

[21] **Error! Hyperlink reference not valid.** (last visited February 18, 2022).

[22] CDC, *Interim Public Health Recommendations for Fully Vaccinated People,* **Error! Hyperlink reference not valid.** (last visited October 18, 2021).

Formatted: Line spacing: single

2021, the Delta strain became dominant.[23] The CDC Director has stated that the vaccines did not stop the transmission of the Delta strain. Studies showed the Delta strain passes easily amongst vaccinated persons.[24] The CDC website states: "… preliminary evidence suggests that fully vaccinated people who do become infected with the Delta variant can spread the virus to others."[25]

52.49. The current Omicron variant has nowand its subvariants have long-since overtaken Delta to become the dominant strain.(s).[26] The Omicron strains, including BA.5, are causing only mild disease[27], and in any event the CDC recognizes that the InjectionsVaccines do not prevent the transmission of or infection from the Omicron variant, just as they did not prevent the transmission of the Delta variant.[28] At best, any protection against infection rapidly wanes.

53.50. The CDC website addressing the Omicron variant states:

> The Omicron variant spreads more easily than earlier variants of the original virus that causescause COVID-19 and,

Formatted: Line spacing: single

---

[23] *Variant Proportions,* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last visited March 1, 2022).

[24] Chau, Nguyen Van Vinh and Ngoc, Nghiem My and Nguyet, Lam Anh and Quang, Vo Minh, OUCRU COVID-19 Research, et al, *Transmission of SARS-CoV-2 Delta Variant Among Vaccinated Healthcare Workers, Vietnam.* ECLINICALMEDICINE, Volume 41, November 2021, 11043 https://doi.org/10.1016/j.eclinm.2021.101143 (last visited March 1, 2022).

[25] *Interim Public Health Recommendations for Fully Vaccinated People* (Archived Version), CENTERS FOR DISEASE CONTROL AND PREVENTION, https://web.archive.org/web/20211018044550/https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (last visited March 1, 2022).

[26] *Omicron Variant: What You Need to Know*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last visited March 1July 20, 2022).

[27] *Omicron BA.5: What we know about this COVID-19 strain*, UC DAVIS HEALTH, updated July 12, 2022, https://health.ucdavis.edu/coronavirus/covid-19-information/omicron-variant (last visited July 20, 2022).

[28] *What You Need to Know About Variants*, CENTERS FOR DISEASE CONTROL AND PREVENTION, updated April 26, 2022, https://www.cdc.gov/coronavirus/2019-ncov/variants/about-variants.html (last visited July 20, 2022).

including the Delta variant. ***CDC expects that anyone with Omicron infection, regardless of vaccination status or whether or not they have symptoms, can spread the virus to others, even if they are vaccinated or don't have symptoms.*** *Id.*.[29] (emphasis added)

54.51. While recognizing the InjectionsVaccines to not prevent transmission of the Virus, the CDC states that the InjectionsVaccines do prevent the severity of symptoms from the disease, stating:

> Scientists are still learning how effective COVID-19 vaccines are at preventing infection from Omicron. Current vaccines are expected toCurrent vaccines protect against severe illness, hospitalizations, and deaths due to infection with the Omicron variant. However, breakthrough infections in people who are vaccinated are likely tocan occur. People who are up to date with their COVID-19 vaccines and get COVID-19 are less likely to develop serious illness than those who are unvaccinated and get COVID-19. Id.

55.52. Thus, the CDC recognizes that the Injections do not prevent transmission but instead may reduce the severity of the symptoms. This is the classic definition of a treatment, not a vaccine.

56.53. This was aptly summed up by Moderna Chief Medical Officer Tal Zaks, who "warned that the trial results show that the vaccine can prevent someone from getting sick or 'severely sick,' from COVID-19, however, the results don't show that

---

[29] *Omicron Variant: What You Need to Know*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last visited July 20, 2022).

Formatted: List Paragraph, Add space between paragraphs of the same style

Formatted: Line spacing: single

the vaccine prevents transmission of the virus."[30]

~~57. Even the FDA has classified Injections as "CBER-Regulated Biologics" otherwise known as "therapeutics" which fall under the "Coronavirus Treatment Acceleration Program."[31]~~

~~58.~~54. The FDA's "therapeutics" classification of the Injections is consistent with representations made by Pfizer injection partner BioNTech to the Securities and Exchange Commission ("SEC") in its 2020 Annual Report, where it stated with regard to the mRNA technology forming the basis of its Injection:

> Although we expect to submit BLAs [biologics license applications] for our mRNA-based product candidates in the United States, and in the European Union, mRNA therapies have been classified as gene therapy medicinal products, and other jurisdictions may consider our mRNA-based product candidates to be new drugs, not biologics or gene therapy medicinal products, and require different marketing applications.[32]

---

[30] Al-Arshani, S (November 2020). *Moderna's chief medical officer says that vaccine trial results only show that they prevent people from getting sick – not necessarily that recipients won't still be able to transmit the virus.* BUSINESS INSIDER. https://www.businessinsider.com/moderna-chief-medical-officer-vaccines-interview-2020-11 (last visited March 1, 2022).

~~[31] *Coronavirus (COVID-19) | CBER-Regulated Biologics*, FOOD AND DRUG ADMINISTRATION (2021).~~ **Error! Hyperlink reference not valid.** ~~(last visited March 1, 2022); *Coronavirus Treatment Acceleration Program (CTAP)*, FOOD AND DRUG ADMINISTRATION (2021),~~ **Error! Hyperlink reference not valid.** ~~(last visited March 1, 2022).~~

[32] *BioNTech SE Form 20-F,* UNITED STATES SECURITIES AND EXCHANGE COMMISSION (2020), https://www.sec.gov/Archives/edgar/data/1776985/000156459021016723/bntx-20f_20201231.htm at page 26 (last visited March 1, 2022).

Formatted: Line spacing: single

~~59.~~55. Similarly, in its June 30, 2020 Quarterly Report to the SEC, Moderna stated with regard to the mRNA technology underpinning its injection: "Currently, mRNA is considered a gene therapy product by the FDA."[33]

**D. The Effects of the COVID Vaccines Wane Rapidly**

~~60.~~56. ~~Additionally, the~~By last year, it was already being observed that any effectiveness of the ~~Injections has been determined to wane~~Vaccines was rapidly waning. Israel, the most vaccinated and studied nation, now expires the ~~vaccine's~~Vaccines' effectiveness at six months.[34] The requirement for booster shots due to this waning of effectiveness has been recognized by the CDC, which initially recommended no booster shots, then annually, then at 8 months and then 6 months.

~~61.~~57. Dr. Anthony Fauci on November 12, 2021, referring to the experience of health officials regarding the ~~Injections~~Vaccines, stated:

> They are seeing a waning of immunity not only against infection but against hospitalization and to some extent death, which is starting to now involve all age groups. It isn't just the elderly. It's waning to the point that you're seeing more and more people getting breakthrough infections, and more and more of those people who are getting breakthrough infections are winding up in the hospital.[35]

---

[33] *Moderna SE Form 10-q,* UNITED STATES SECURITIES AND EXCHANGE COMMISSION (2020), https://www.sec.gov/Archives/edgar/data/1682852/000168285220000017/mrna-20200630.htm at page 70 (last visited March 1, 2022).

[34] Marianne Guenot, *Israel's Vaccine Pass Will Expire 6 Months after 2nd Dose, Meaning People Will Need Booster Shots to Keep Going to Restaurants and Bars,* BUSINESS INSIDER, https://www.businessinsider.com/israel-vaccine-pass-to-expire-after-6-months-booster-shots-2021-9 (last visited March 1, 2022).

[35] Coleman, K (November 12, 2021). *Dr. Fauci Just Issued This Urgent Warning to Vaccinated People,* YAHOO NEWS, https://www.yahoo.com/lifestyle/dr-fauci-just-issued-urgent-201846228.html (last visited March 1, 2022).

Formatted: Line spacing: single

~~62.~~58. Those countries with the highest rates of the ~~Injections~~Vaccines also experience the highest rates of infection. Those countries with the highest rates of the ~~Injections~~Vaccines also have the highest rates of hospitalization and severe illnesses with regard to the prior Delta strain as well as the Omicron strain, which is the current strain of the Virus.

59. The spread of the Omicron strain combined with the waning of immunity has only reinforced this trend. On July 12, 2022, Dr. Anthony Fauci acknowledged in an interview that:

> One of the things that's clear from the data [is] that even though vaccines - because of the high degree of transmissibility of this virus - don't protect overly well, as it were, against infection, they protect quite well against severe disease leading to hospitalization and death. And I believe that's the reason, Neil, why at my age, being vaccinated and boosted, even though it didn't protect me against infection, I feel confident that it made a major role in protecting me from progressing to severe disease.[36]

**E. VAERS Reports Point to Significant Levels of Vaccine Injury.**

~~63.~~60. As part of the 1990 Public Readiness and Emergency Preparedness Act, the FDA and CDC created the Vaccine Adverse Event Reporting System (VAERS) to receive reports about suspected adverse events that may be associated with vaccines. VAERS is intended to serve as an early warning system to safety issues.

~~64.~~61. It has been well established even prior to COVID that only 1-10% of

[36] "Fauci admits that COVID-19 vaccines do not protect 'overly well' against infection," FOX NEWS, https://www.foxnews.com/media/fauci-admits-covid-19-vaccines-protect-overly-well-infection (last visited July 18, 2022).

Formatted: Line spacing: single

adverse events are reported.[37] This is known as the "Under-Reporting Factor" (URFs). While many reported adverse events are mild, about 15% of total adverse events are found to be serious adverse events.[38]

65.62. As one can see from this chart, VAERS reports regarding the COVID vaccines are extraordinarily high.

Figure 1: Bar plots showing the number of VAERS reports (left) and reported deaths (right) per year for the past decade. (2021 is partial data set.)

Figure 1: Bar plots showing the number of VAERS reports (left) and reported deaths (right) per year for the past decade. (2021 is partial data set.)

**F. COVID Vaccines Create Immunological Cripples, Vaccine Addicts, Super-Spreaders, and a Higher Chance of Death and Severe Hospitalization**

66.63. The COVID ~~vaccines~~Vaccines are not traditional vaccines.[39] Instead most carry coded instructions that cause cells to reproduce one portion of the SARS-CoV-2

Formatted: Line spacing: single

[37] Lazarus, Ross et al. Grant ID: R18 HS 017045. *Electronic Support for Public Health–Vaccine Adverse Event Reporting System (ESP:VAERS)*. Submitted to The Agency for Healthcare Research and Quality (AHRQ).

[38] Department of Health and Human Services, *VAERS Data Use Guide*, https://vaers.hhs.gov/docs/VAERSDataUseGuide_November2020.pdf (last visited October 18, 2021).

[39] FDA, *Coronavirus (COVID-19) | CBER-Regulated Biologics*, https://www.fda.gov/vaccines-blood-biologics/industry-biologics/coronavirus-covid-19-cber-regulated-biologics; *See also,* FDA,

virus, the spike protein. The vaccines thus induce the body to create spike proteins. A person only creates antibodies against this one limited portion (the spike protein) of the virus. This has several downstream deleterious effects.

~~67.~~64. First, these ~~vaccines~~Vaccines "mis-train" the immune system to recognize only a small part of the virus (the spike protein). Variants that differ, even slightly, in this protein, are able to escape the narrow spectrum of antibodies created by the ~~vaccines~~Vaccines. This problem of immune escape has been even more widely acknowledged during the Omicron wave.

~~68.~~65. Second, the ~~vaccines~~Vaccines create "vaccine addicts," meaning persons become dependent upon regular booster shots, because they have been "vaccinated" only against a tiny portion of a mutating virus. The Australian Health Minister Dr. Kerry Chant has stated that COVID will be with us forever and people will "have to get used to" taking endless vaccines. "This will be a regular cycle of vaccination and revaccination."[40]

*Coronavirus Treatment Acceleration Program (CTAP)*, https://www.fda.gov/drugs/coronavirus-covid-19-drugs/coronavirus-treatment-acceleration-program-ctap (last visited October 18, 2021).

[40] Tyler Durden, *Aussie Health Chief: COVID Will Be With Us Forever", People Will Have to "Get Used To" Endless Booster Vaccines,* https://www.zerohedge.com/covid-19/aussie-health-chief-covid-will-be-us-forever-people-will-have-get-used-endless-booster (last visited October 18, 2021).

Formatted: Line spacing: single

~~69.~~66. Third, the ~~vaccines~~Vaccines do not prevent infection in the nose and upper airways, and vaccinated and even boosted individuals ~~have been~~ can be a transmission risk for even longer than unvaccinated persons, as shown ~~to have much higher viral~~

169

170 171 172 173 174 175 176 177

**Supplementary Figure S1.** Kaplan-Meier survival curves demonstrating time from the earlier of symptom onset or initial positive PCR to negative PCR by viral variant (A) and vaccination status (C) and time from the earlier of symptom onset or initial positive PCR to negative viral culture by viral variant (B) and vaccination status (D). Shaded areas indicate 95% confidence intervals.

~~loads~~ in ~~these regions. This leads to~~ the ~~vaccinated becoming "super-spreaders" as they are carrying extremely high viral loads.~~ chart below.[41]

~~70.~~67. In addition, the vaccinated become more clinically ill than the unvaccinated. Scotland reported that the infection fatality rate in the vaccinated is 3.3 times the unvaccinated and the risk of death if hospitalized is 2.15 times the unvaccinated.[42]

---

[41] ~~Chau, Nguyen Van Vinh, et al., OUCRU COVID-19 Research, Transmission of SARS-CoV-2 Delta Variant Among Vaccinated Healthcare Workers (abstract), Vietnam. EClinicalMedicine, Volume 41, November 2021, 101143, Available at SSRN:~~ **Error! Hyperlink reference not valid.** ~~or~~ **Error! Hyperlink reference not valid.** Boucau J, Marino C, Regan J, et al., *Duration of shedding of culturable virus in SARS-CoV-2 omicron (BA.1) infection*. N ENGL J MED. June 29, 2022, DOI: 10.1056, available at https://www.nejm.org/doi/full/10.1056/NEJMc2202092; *see especially* id., at Supp. Appdx., available at https://www.nejm.org/doi/suppl/10.1056/NEJMc2202092/suppl_file/nejmc2202092_appendix.pdf.

[42] Jeffrey Dach, Protecting Public Health with Mandatory Vaccination, https://jeffreydachmd.com/wp-content/uploads/2021/08/Public-Health-Scotland-21-08-04-covid19-publication_report.pdf, (last visited ~~October 18, 2021~~July 20, 2022), *See also*, Jeffrey Dach, Public Health Scotland COVID-19 Statistical Report,

**Formatted:** Footnote Reference,Style 6, Font: 12 pt, Not Superscript/ Subscript

**Formatted:** Line spacing: single

**Formatted:** Font: 10 pt

**Formatted:** Footnote Text,Style 7

**Formatted:** Font: 10 pt

**FACTUAL ALLEGATIONS SPECIFIC TO THE INDIVIDUAL PLAINTIFFS**

~~71.~~68. Plaintiffs reallege the foregoing allegations as if fully set forth herein.

69. As alleged above, Plaintiff HFDF is a not-for-profit, membership organization that seeks to advocate for and educate the public on the topics of medical choice, bodily autonomy, and self-determination, and that opposes laws and regulations that force individuals to submit to the administration of medical products, procedures, and devices against their will. Several of HFDF's members are present LAUSD employees who have been terminated, placed on involuntary unpaid leave, or demoted as a result of their unvaccinated status.

70. As alleged above, Plaintiff CAEMF is a voluntary, unincorporated association of California state education employees whose purpose is to advocate for medical choice and bodily autonomy on behalf of its members, vis a vis the Mandate. Its membership includes numerous employees of LAUSD who have been terminated, placed on involuntary unpaid leave, or demoted as a result of their unvaccinated status.

~~72.~~ The individual Plaintiffs are all employees of LAUSD who are directly affected by the Mandate and are imminently threatened with termination as a result thereof.

~~73.~~71. ~~Plaintiff Miguel Sotelo has worked as an Electrician for LAUSD for 6 years. He is a single father with three children, aged 3, 15, and 19. His 3-year old daughter has special needs. He has been away from work due to an on-the-job injury. He must wait six months for surgery, and then will have six months of rehabilitative therapy after that before he can be cleared for work. He did not apply for an exemption because he was told that personnel who cannot work remotely will not be~~

https://jeffreydachmd.com/wp-content/uploads/2021/08/Public-Health-Scotland-21-09-01-covid19-publication_report.pdf (last visited ~~October 18, 2021)~~ **Error! Hyperlink reference not valid.**~~e~~ July 20, 2022).

Formatted: Line spacing: single

~~accommodated, and that he therefore faces termination, regardless of his ability to obtain an exemption.~~

~~74.~~72. Plaintiff Jeffrey Fuentes has been employed by LAUSD as an Electrician for 8 years. He is opposed to being administered the COVID vaccine due to his sincerely-held religious beliefs, which include the use of medicines that have been derived from aborted fetal tissue. Mr. Fuentes applied for a religious exemption, which he was told was accepted; however, he has received nothing in writing, and his supervisors and superiors have repeatedly told him that there are no accommodations for his classification of employment, thus rendering his religious exemption illusory. Absent an accommodation, he faces imminent termination.

~~75.~~73. Plaintiff Sandra Garcia was an employee with LAUSD for 10 years and worked as a Special Education Assistant at a middle school. She is married and has a 4-year-old son. Ms. Garcia believes that she had COVID-19 in November 2020 and that she has natural immunity as a result. Beyond that, she objects to being vaccinated against COVID due to her sincerely-held religious beliefs, as the COVID Vaccines are made using aborted fetal cells. She applied for a religious exemption, which was granted, but she was denied an accommodation, thus rendering the exemption illusory and placing in imminent peril of being terminated. Beyond her religious beliefs, Ms. Garcia has concerns about the safety of the vaccines. For example, the teenaged son of one of her acquaintances developed myocarditis from being vaccinated. Ms. Garcia was terminated from employment by LAUSD in December 2021 for refusing to be vaccinated against her will.

~~76.~~74. Plaintiff Hovhannes Saponghian was employed by LAUSD for two years as a Teacher Assistant. He had COVID-19 in October 2021 and therefore has natural immunity. Mr. Saponghian objects to vaccination on religious grounds because of the use of aborted fetal cell tissue in making them. He applied for a religious exemption, which was granted, but he was denied an accommodation, thus rendering the exemption

illusory. He also has concerns about short-term side effects, such as death, myocarditis, and blood clots, as well as long-term side effects, which remain unknown. Since the filing of this lawsuit, he has been separated from his employment with LAUSD.

~~77.~~75. Plaintiff Norma Brambila is a healthcare assistant at LAUSD. She objects to vaccination on religious grounds because of the use of aborted fetal cell tissue in making them and therefore applied for a religious exemption. LAUSD acknowledged that her beliefs were genuine but refused to accommodate her. She was placed on unpaid leave effective November 1st and was terminated by LAUSD since the filing of this lawsuit. Plaintiff Brambila previously recovered from COVID and has natural immunity. However, she has been informed that medical exemptions are only available for disability or serious medical conditions.

~~78.~~76. All conditions precedent to this action have been performed, excused, and/or waived.

**FIRST CAUSE OF ACTION**

**VIOLATION OF THE FOURTEENTH AMENDMENT**

**SUBSTANTIVE DUE PROCESS -- 42 U.S.C. § 1983**

**(Plaintiffs Against All Defendants)**

~~79.~~77. Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through ~~78~~76 as if fully set forth herein.

~~80.~~78. The Vaccine Mandate violates the liberty protected by the Fourteenth Amendment to the Constitution, which includes rights of personal autonomy, self-determination, bodily integrity and the right to reject medical treatment.

~~81.~~79. The COVID vaccines are not vaccines, as that term has traditionally been understood, but are, as a factual matter, treatments. They are referred to herein as vaccines, but they are not. They are treatments. Indeed, the CDC even recently changed its own definitions of "Vaccine" and "Vaccination" to eliminate the word, "immunity."

~~82.~~80. The ability to decide whether to accept or refuse medical treatment is a fundamental right.

~~83.~~81. Accordingly, the Vaccine Mandate violates Plaintiffs' constitutional right to decisional privacy with regard to medical treatment.

~~84.~~82. Because the COVID vaccines are not treatments, and not vaccines, strict scrutiny applies. The US Supreme Court has recognized a "general liberty interest in refusing medical treatment." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278, 110 S. Ct. 2841, 2851, 111 L.Ed.2d 224, 242 (1990). It has also recognized that the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. *Washington v. Harper*, 494 U.S. 210, 229, 110 S. Ct. 1028, 1041, 108 L.Ed.2d 178, 203 (1990), see also *id*. at 223 (further acknowledging in dicta that, outside of the prison context, the right to refuse treatment would be a "fundamental right" subject to strict scrutiny).

~~85.~~83. As mandated medical treatments are a substantial burden, Defendants must prove that the Vaccine Mandate is narrowly tailored to meet a compelling interest.

~~86.~~84. No such compelling interest exists because, as alleged above, the COVID vaccines are not effective against the now dominant Omicron variant of COVID in that they do not prevent the recipient from becoming infected, getting reinfected, or transmitting COVID to others. Indeed, evidence shows that vaccinated individuals have more COVID in their nasal passages than unvaccinated people do. The Omicron variant is the current variant and accounts for 100% of the COVID infections in the United States at this time.

~~87.~~85. The COVID vaccines may have been somewhat effective against the original COVID strain, but that strain has come and gone, and the COVID vaccines—designed to fight yesterday's threat—are simply unable to prevent infection from the current Omicron variant.

~~88.~~86. Since the COVID vaccines lack efficacy to prevent infection and transmission, there can be no compelling interest to mandate their use at this time.

~~89.~~87. But even if there were a compelling interest in mandating the COVID vaccinations, the Vaccine Mandate is not narrowly tailored to achieve such an interest.

~~90.~~88. The blanket Mandate ignores individual factors increasing or decreasing the risks that the plaintiffs—indeed, all LAUSD employees—pose to themselves or to others.

~~91.~~89. Defendants entirely disregard whether employees have acquired natural immunity, despite the fact that natural immunity does actually provide robust immunity that is superior to the protection afforded by the vaccines.

~~92.~~90. Treating all employees the same, regardless of their individual medical status, risk factors, and natural immunity status is not narrowly tailored.

~~93.~~91. Indeed, even if the test set forth in *Jacobson* was the appropriate standard, which it is not, the Vaccine Mandate would still fail to satisfy that standard for the reasons set forth above.

~~94.~~92. "[I]f a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Jacobson v. Massachusetts*, 197 U.S. 11, 31, 25 S. Ct. 358, 363, 49 L.Ed. 643 (1905).

~~95.~~93. By the CDC's own admission, by the admission of other public health authorities, the available vaccines for COVID do not confer sterile immunity. Rather, they simply lessen the severity of symptoms for individuals who receive them. They are actually therapeutic treatments for COVID and not vaccines at all.

~~96.~~94. COVID vaccines cripple the immune systems of some of those to whom they are administered and also cause vaccine-based dependency.

97.95. Assuming for the purposes of argument that PCR tests are effective, then an adequate alternative to vaccination exists.

98.96. Given these facts, as more fully set forth above, the Vaccination Mandate has no real or substantial relation to public health or is beyond all question, a plain, palpable invasion of rights secured by the fundamental law. Alternatively, the Vaccination Mandate has no real or substantial relation to public health or is beyond all question, a plain, palpable invasion of rights secured by the fundamental law as to those Plaintiffs with natural immunity. It is therefore unconstitutional regardless of which standard of review is applied.

99.97. Pursuant to 42 U.S.C. § 1983 and other applicable law, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing the Vaccine Mandate.

100.98. Pursuant to 28 U.S. Code §§ 2201-02 and other applicable law, Plaintiffs are entitled to a declaration that the Vaccine Mandate is unlawful and any further relief which may be appropriate.

**SECOND CAUSE OF ACTION**

**Violation of Fourteenth Amendment**

**Equal Protection -- 42 U.S.C. § 1983**

**(Plaintiffs Against All Defendants)**

101.99. Plaintiffs reallege and incorporate by reference their allegations in Paragraphs 1 through 7876 as if fully alleged herein.

Formatted: Indent: Left: 0.5", Hanging: 0.5"

102.100. The Equal Protection Clause prohibits classifications that affect some groups of citizens differently than others. (*Engquist v. Or. Dept. of Agric.* (2008) 553 U.S. 591, 601.) The touchstone of this analysis is whether a state creates disparity between classes of individuals whose situations are arguably indistinguishable. (Ross v. Moffitt (1974) 417 U.S. 600,609.)

~~103.~~101. The Mandate creates two classes of LAUSD employees; vaccinated and unvaccinated, as well as employees who have reported their vaccination status to LAUSD and those who have not. The members of one class, the unvaccinated, get terminated. The same is true for the non-reporting class irrespective of vaccination status. In either event they cannot advance their careers. They cannot provide for their families, pay their mortgages, or make a car payment. The other class, the vaccinated and reporting, gets to keep their job in their chosen profession, advance their careers, provide for their families, pay their mortgages, and make their car payments.

~~104.~~102. Yet the situations of these employees are indistinguishable because vaccinated and reporting LAUSD employees can become infected with COVID, become re-infected with COVID, and can transmit COVID to fellow employees, school visitors, and students. The vaccines make no difference in these respects. Their only function is to make symptoms less severe.

~~105.~~103. Discriminating against the unvaccinated and non-reporting controverts the goals of the Equal Protection Clause – i.e., to abolish barriers presenting unreasonable obstacles to advancement on the basis of individual merit.

~~106.~~104. Pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing the Vaccine Mandate.

~~**THIRD CAUSE OF ACTION**~~

~~**Declaratory and Injunctive Relief under Cal. Constitution**~~

~~**(Plaintiffs Against All Defendants)**~~

~~107. Plaintiffs reallege and incorporate by reference their allegations in Paragraphs 1 through 78 as if fully alleged herein.~~

~~108. The Plaintiffs are employed by LAUSD. They have not complied with LAUSD's Mandate, including reporting of their vaccination status. They object to being~~

~~compelled to turn over their private medical information to LAUSD as a condition of their continued employment.~~

~~109. Individuals have a right to privacy under the California Constitution. This state law privacy right, which was added by voters in 1972, is far broader than the right to privacy under the federal Constitution. It is the broadest privacy right in America and has been interpreted by the California Supreme Court to protect both the right to informational privacy and to bodily integrity.~~

~~110. LAUSD employees have a legally protected privacy interest not just in their bodily integrity, but their private medical information as well. Their expectation of privacy is reasonable. LAUSD's Mandate constitutes a serious invasion of those privacy rights, as alleged above.~~

~~111. Although LAUSD may argue that the vaccine mandate serves a compelling interest, there are feasible and effective alternatives that have a lesser impact on privacy interests. Thus, LAUSD's mandate will not survive strict scrutiny.~~

~~112. On information and belief, LAUSD contends that its mandate does not violate the privacy rights of LAUSD employees or satisfies strict scrutiny.~~

~~113. Plaintiffs desire a judicial declaration that LAUSD's Mandate is facially unconstitutional because it violates LAUSD's employees' right to privacy under the California Constitution.~~

~~114. A judicial determination of these issues is necessary and appropriate because such a declaration will clarify the parties' rights and obligations, permit them to have certainty regarding those rights and potential liability, and avoid a multiplicity of actions.~~

~~115. LAUSD's actions have harmed Plaintiffs among other LAUSD employees, as alleged above.~~

116. Plaintiffs have no adequate remedy at law and will suffer irreparable harm if the Court does not declare the Mandate unconstitutional. Thus, they seek preliminary and permanent injunctive relief enjoining LAUSD from enforcing the mandate.

117. This action serves the public interest, justifying an award of attorneys' fees under section 1021.5 of the California Code of Civil Procedure.

**FOURTH CAUSE OF ACTION**

**Declaratory and Injunctive Relief under Americans with Disabilities Act**

**42 USC §§ 12101, *et seq*. – Disparate Treatment and Failure-To-Accommodate**

**(Plaintiffs Against Defendants)**

118. Plaintiffs reallege and incorporate by reference their allegations in Paragraphs 1 through 78 as if fully alleged herein.

119. Defendants' enforcement of the Mandate through termination of non-compliant Plaintiffs without engaging in an interactive process with each employee to identify and implement appropriate reasonable accommodations enabling the employee to perform their job duties directly violates, and conflicts with, their duties and obligations under the Americans with Disabilities Act ("ADA"). 42 USC §§ 12101, et seq.

120. Defendants have threatened to, and in several instances have, placed Plaintiffs on administrative leave and threatened termination from their employment because of Defendants' belief that Plaintiffs' physical condition of being unvaccinated and/or having failed to report their vaccination status makes them incapable of performing the duties they have performed competently for nearly two years since the COVID pandemic first appeared.

121. Defendants' mandatory vaccination is based on Defendants' perception that those who are unvaccinated present a danger of infection to themselves from contact with others and a danger to others from contagion. As a consequence, it is apparently Defendants' view that without the safety of vaccination and reporting the

~~Plaintiffs are not capable of performing their work by reason of their physical condition and thus are regarded as being disabled.~~

~~122. Defendants' threat to terminate the Plaintiffs' employment by reason of their physical condition constitutes discrimination on the basis of a perception of disability in violation of the ADA, 42 USC 126. See, §§ 12102(3) (forbidding discrimination on the basis of a person being regarded as having an impairment); and § 12112 (forbidding any impairment in the terms of employment of an individual on the basis of a perception of impairment.)~~

~~123. Further Plaintiffs are qualified individuals with a disability, because they remain able, with or without reasonable accommodation, to perform the essential functions of the employment position that Plaintiffs hold, as demonstrated by the fact Plaintiffs' have performed their essential job functions competently for nearly two years since the COVID pandemic first appeared and, in many instances, continued those operations without cessation during worst of the pandemic as essential workers.~~

~~124. Further, assuming for the sake of argument, Plaintiffs become unable to perform their essential job functions by virtue Defendants' perception that as of the arbitrary and capricious deadlines specified in the Mandate unvaccinated and/or non-reporting employees then present a danger of infection to themselves from contact with others and a danger to others from contagion, there exists an abundance of reasonable accommodations designed to mitigate the risk of contagion that LAUSD implemented, and relied on, such as remote work, social distancing, erection of transparent barriers, face masking, alternate shifts to alleviate crowding in the work place, advanced cleaning protocols, and efforts to improve ventilation, among other things.~~

~~125. An actual controversy involving justiciable questions related to this controversy exists related to the rights and obligations of the respective parties with respect to the ADA.~~

~~126. Plaintiffs seek a judicial declaration that proceeding with the imposition of the threatened employment sanctions is a violation of the ADA and seek an order restraining and enjoining Defendants from violation of the ADA by employment sanction on the basis of perceived physical disability.~~

**~~FIFTH CAUSE OF ACTION~~**

**~~Violation of Due Process – *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194~~**

**~~(Plaintiffs Against all Defendants)~~**

~~127. Plaintiffs reallege and incorporate by reference their allegations in Paragraphs 1 through 78 as if fully alleged herein.~~

~~128. Defendants have suspended various LAUSD employees, including Plaintiffs by placing them on administrative leave for failure to comply with the Mandate.~~

~~129. Under *Skelly v. State Personnel Bd.*, 15 Cal.3d 194 (1975) and its progeny Plaintiffs have a property interest in continued employment with LAUSD protected by due process.~~

~~130. On information and belief, LAUSD contends that it does not have to afford Plaintiffs a full and complete Skelly hearing and rights and has instead suspended its employees administratively including the Plaintiffs for five days or more, without a hearing within a reasonable time thereafter and providing written notice explaining: (i) the charge; (ii) proposed discipline; (iii) the policy or rule violated; (iv) the factual basis for the same; (v) produced the documents purporting to support the charge(s); (vi) containing a date for an in-person hearing; and (vii) the deadline for any response.~~

~~131. An actual controversy involving justiciable questions related to this controversy exists related to the rights and obligations of the respective parties with respect to Plaintiffs' and LAUSD employees' rights under *Skelly* and its progeny.~~

~~132. Plaintiffs seek a judicial declaration that proceeding with the imposition of the threatened employment sanctions is a violation of *Skelly* and seek an order~~

~~restraining and enjoining Defendants from proceeding with the imposition of the threatened employment sanctions before affording due process under *Skelly*.~~

**~~SIXTH CAUSE OF ACTION~~**

**~~Public Disclosure of Private Facts~~**

**~~(Plaintiffs Against all Defendants)~~**

~~133. Plaintiffs reallege and incorporate by reference their allegations in Paragraphs 1 through 78 as if fully alleged herein.~~

~~134. Defendants received private, biological and genetic information from Plaintiffs by requiring biological tests preparatory for requiring mandatory vaccination as a condition of retained employment. Defendants disclosed the information derived from said tests to Fulgent under a contract that enabled Fulgent to utilize blockchain technology to keep, retain and share said information to unlimited persons and companies unknown, including governmental agencies, without the knowledge, permission or consent of the Plaintiffs. The information derived by the Defendants and disclosed to Fulgent and, through Fulgent, publicly to thousands of persons and companies unknown to Plaintiffs, was private and intended to be kept so, the disclosure of which would be highly offensive to persons of normal sensibility.~~

~~135. Defendants knew or acted with reckless disregard of the fact that the disclosure and dissemination of said information would be highly offensive and damaging to the Plaintiffs and, disregarding their duty, disclosed same.~~

~~136. The information Defendants disclosed was not information of legitimate concern to those who received it and those to whom it was disseminated.~~

~~137. As a result of the Defendants' conduct as herein alleged, Plaintiffs have been harmed and injured to an extent that has not, as yet, been fully quantified. Plaintiffs will seek leave to amend this complaint to allege the full extent of said damage when same has been fully ascertained.~~

~~138. Plaintiffs seek a judicial declaration that Defendants violated Plaintiffs'~~

~~privacy with regard to their medical information and will seek an order restraining and enjoining Defendants from maintaining or disseminating LAUSD employees' medical information, including through a third party, Fulgent.~~

**~~SEVENTH CAUSE OF ACTION~~**

**~~Breach of Security for Computerized Personal Information~~**

**~~(Plaintiffs Against all Defendants)~~**

~~139. Plaintiffs reallege and incorporate by reference their allegations in Paragraphs 1 through 78 as if fully alleged herein.~~

~~140. Defendants own computerized data, specifically genetic and medical data related to the Plaintiffs herein, that was represented to be private and protected. In violation of the Defendants' duties under California Civil Code 1798.29 and 1798.82, Defendants allowed said information to be shared with Fulgent that disclosed same to unknown millions of people and organizations through the use of blockchain technology and pursuant to a contract with LAUSD that allowed it to do so.~~

~~141. Defendants knew or acted with reckless disregard of the fact that the disclosure and dissemination of said information would be highly offensive and damaging to the Plaintiffs and, disregarding their duty, disclosed the same.~~

~~142. The information Defendants disclosed was not information of legitimate concern to those who received it and those to whom it was disseminated.~~

~~143. As a result of the Defendants' conduct as herein alleged, Plaintiffs have been harmed and injured to an extent that has not, as yet, been fully quantified. Plaintiffs will seek leave to amend this complaint to allege the full extent of said damage when same has been fully ascertained.~~

~~144. Plaintiffs seek a judicial declaration that Defendants' violated Plaintiffs' privacy by disseminating their medical information to Fulgent and seek an order restraining and enjoining Defendants from maintaining or disseminating LAUSD employees' medical information, including through a third party, Fulgent.~~

**PRAYER**

Wherefore, Plaintiffs pray for judgment in their favor and against Defendants as follows:

**ON THE FIRST CAUSE OF ACTION**

1. Temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing the Mandate; and

2. For reasonable attorneys' fees.

**ON THE SECOND CAUSE OF ACTION**

1. Temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing the Vaccine Mandate; and

2. For reasonable attorneys' fees.

~~**ON THE THIRD CAUSE OF ACTION**~~

~~1. A judicial declaration that LAUSD's Mandate is facially unconstitutional because it violates Plaintiffs' and LAUSD employees' right to privacy under the California Constitution; and~~

~~2. Preliminary and permanent injunctive relief enjoining LAUSD from enforcing the Mandate.~~

~~**ON THE FOURTH CAUSE OF ACTION**~~

~~1. A judicial declaration that proceeding with the imposition of the threatened employment sanctions is a violation of the ADA; and~~

~~2. An order restraining and enjoining Defendants from violation of the ADA by employment sanction on the basis of perceived physical disability.~~

~~**ON THE FIFTH CAUSE OF ACTION**~~

~~1. A judicial declaration that proceeding with the imposition of the threatened employment sanctions is a violation of *Skelly*; and~~

~~2. An order restraining and enjoining Defendants from proceeding with the imposition of the threatened employment sanctions before affording due process under~~

~~*Skelly*.~~

~~**ON THE SIXTH CAUSE OF ACTION**~~

~~1. A judicial declaration that Defendants violated Plaintiffs' privacy with regard to their medical information; and~~

~~2. An order restraining and enjoining Defendants from maintaining or disseminating LAUSD employees' medical information, including through a third party, Fulgent.~~

~~**ON THE SEVENTH CAUSE OF ACTION**~~

~~1. A judicial declaration that Defendants' violated Plaintiffs' privacy by disseminating their medical information to Fulgent; and~~

~~2. An order restraining and enjoining Defendants from maintaining or disseminating LAUSD employees' medical information, including through a third party, Fulgent.~~

**ON ALL CAUSES OF ACTION**

1. For judgment in favor of Plaintiffs;
2. For costs of suit herein; and
3. For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

ADVOCATES FOR FAITH & FREEDOM

Dated: ~~March 10~~July 25, 2022 /s/ Robert H. Tyler, Esq.
Robert H. Tyler

HADAWAY, PLLC

Dated: ~~March 10~~July 25, 2022 /s/ Brant C. Hadaway, Esq.
Brant C. Hadaway

Hadaway, PLLC

DAVILLIER LAW GROUP, LLC

Dated: ~~March 10~~July 25, 2022          /s/ George R. Wentz, Esq.
George R. Wentz

Attorneys for Plaintiffs

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a right to a jury trial for all matters so triable.

ADVOCATES FOR FAITH & FREEDOM

Dated: ~~March 10~~July 25, 2022          /s/ Robert H. Tyler, Esq.
Robert H. Tyler

HADAWAY, PLLC

Dated: ~~March 10~~July 25, 2022          /s/ Brant C. Hadaway, Esq.
Brant C. Hadaway

DAVILLIER LAW GROUP, LLC

Dated: ~~March 10~~July 25, 2022          /s/ George R. Wentz, Esq.
George R. Wentz

Attorneys for Plaintiffs

39

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
AND DECLARATORY AND INJUNCTIVE RELIEF